# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

UNITED STATES OF AMERICA ex rel. JOSHUA LUKE,

Plaintiff,

v.

HEALTHSOUTH CORPORATION, et al.,

Defendants.

Case No. 2:13-cv-01319-APG-VCF

**ORDER ON MOTIONS TO DISMISS**

(ECF Nos. 58, 59, 60)

Defendants Healthsouth Corporation (Healthsouth); Healthsouth of Henderson, Inc. (Henderson); Kenneth Bowman; Jerry Gray; and Jaya Patel filed three motions to dismiss. ECF Nos. 58, 59, 60. Generally, the defendants argue that the complaint fails to adequately allege a claim under the False Claims Act (FCA) under Federal Rule of Civil Procedure 9(b)'s particularity requirement. Additionally, all defendants except Healthsouth move to dismiss on the basis that the complaint does not actually assert a claim against them. Finally, Healthsouth and Gray assert that the complaint fails to state a claim against them because mere knowledge of someone else's alleged FCA fraud (in this case, Henderson's) is insufficient to impose liability.

Relator Joshua Luke responds that the complaint adequately sets forth a fraudulent course of conduct by which Henderson manipulated its evaluation of the dependency level of incoming patients and intentionally misrepresented the patients' disability ratings regardless of the patients' actual capabilities. Luke alleges that Henderson did so in order to report lower Functional Independence Measure (FIM) scores to the Department of Health and Human Services, Center for Medicare and Medicaid Services (CMS). According to Luke, CMS uses the FIM score to determine what services a facility like Henderson is expected to provide to patients, and thus CMS in part bases the amount of prospective Medicare payments that it will pay on the FIM. The lower the FIM, the higher the reimbursement payment. Luke contends Henderson successfully

implemented its plan, resulting in an overall higher rate of reimbursement compared to other Healthsouth facilities in the region. Luke admits the complaint is deficient in asserting claims against any defendant except Healthsouth and requests leave to amend to correct this pleading error. However, he contends with amendment he can adequately allege that Healthsouth and Gray (as well as Henderson, Bowman, and Patel) are liable for the allegedly fraudulent scheme.

I grant the motion to dismiss all defendants except Healthsouth because Luke concedes he inadvertently failed to assert a claim against the other defendants. I grant the motion to dismiss Healthsouth because Luke has not alleged with particularity anything more than silence or inaction coupled with knowledge of Henderson's activities. I deny as moot the motion to dismiss under Rule 9(b). I grant Luke leave to amend to not only correct the deficiencies identified in this order but also to address the arguments raised in the moot motion if Luke chooses to do so.

**I. BACKGROUND**

Defendant Healthsouth operates rehabilitation hospitals through subsidiary companies. ECF No. 1 at 4, 11. Defendant Henderson is one such subsidiary that is an inpatient rehabilitation facility. *Id.* at 5. Defendant Bowman was Henderson's chief executive officer from 2009 to February 2012. *Id.* at 5. Defendant Patel was the Prospective Payment System coordinator for Henderson during the relevant time frame, and remains in that position. *Id.* at 5. Relator Luke was the chief executive officer of Healthsouth Rehabilitation Hospital of Las Vegas, another of Healthsouth's facilities, from September 2011 to July 2012. *Id.* at 4, 11. During the relevant time period, Healthsouth operated fourteen such hospitals in the west region, which includes the Henderson and Las Vegas facilities. *Id.* at 11. Defendant Gray was Healthsouth's regional president for the west region. *Id.*

According to the complaint, in January 2005, Healthsouth entered into a corporate integrity agreement with the Department of Health and Human Services' Office of Inspector General. *Id.* at 21-22; ECF No. 1-1. That agreement covers Healthsouth and all of its wholly owned subsidiaries that are engaged in providing rehabilitation hospital services. ECF No. 1 at 22. Under the agreement, Healthsouth was required to prepare a code of conduct and establish a

compliance program designed to prevent violations of any federal healthcare program, including requiring all Healthsouth employees to comply with all federal healthcare program requirements and to report to a compliance officer any suspected violations. *Id.* This includes a requirement to report overpayments. ECF No. 1-1 at 30.

Under Medicare Part A, the United States reimburses inpatient rehabilitation facilities like Henderson based on the amount of resources the facility is expected to expend on a Medicare beneficiary's rehabilitation under a prospective payment system. ECF No. 1 at 8. That prospective payment system requires the facility to use a patient assessment instrument to evaluate each incoming patient's disability level upon admission to the facility. *Id.* at 9. To do so, the facility's staff uses the FIM scoring system to determine an Admit FIM score, which essentially is a disability rating. *Id.* The score is based on both physical and mental abilities, including grooming, toileting, eating, and dressing. *Id.*

Those scores are then used to assign the patient to a case-mix group and to different tiers depending on the severity of comorbid disorders. *Id.* at 9-10. Each case-mix group and tier combination is given weight aimed at representing the anticipated resources the facility will expend to rehabilitate that patient. *Id.* at 10. CMS, which administers this Medicare program, then takes that relative weight and multiplies it by a conversion factor to determine the amount the United States will prospectively pay the facility. *Id.* CMS also applies certain adjustments to the payment, such as if the patient's stay at the facility was interrupted or if the facility is located in a rural area. *Id.* According to the complaint, inpatient rehabilitation facility staff input the FIM data directly into software that CMS then uses for payment purposes. *Id.*

Luke alleges that the Admit FIM score impacts the prospective reimbursement amount because the lower the score, the higher the likely reimbursement. *Id.* at 10-11. Thus, if a facility falsely exaggerates a patient's disabilities to generate a low Admit FIM score, it may result in a fraudulently inflated reimbursement amount. *Id.* Luke alleges Henderson engaged in a fraudulent course of conduct to artificially lower Admit FIM scores for all incoming patients as more fully described below.

Luke alleges that within a few months after starting his position at the Las Vegas facility, he reviewed financial data for Healthsouth facilities in the west region and noted that Henderson regularly was the highest financial performer. *Id.* at 12. Luke also noticed that Henderson's overall Admit FIM score was consistently significantly lower than other hospitals in the west region in 2011 and 2012. *Id.* Luke began to investigate why this was the case. *Id.*

At a February 2012 regional meeting, Luke spoke to Barbara Feth, who serves as Healthsouth's regional director of therapy operations for the west region and as the associate national director of therapy operations. *Id.* at 13. According to the complaint, Feth told Luke that Henderson, under the direction of Bowman and Patel, was using a different scoring system than other Healthsouth facilities. *Id.* At this same meeting, Luke alleges he spoke with Glen Piche, regional director of marketing operations, Nina Beck, chief financial officer for the west region, and Diane Fenstra, region business office manager for the west region. *Id.* According to Luke, Beck and Fenstra both acknowledge that Henderson's Admit FIM scores appeared to be unrealistically low. *Id.*

Luke reached out to Bowman to see if he could schedule a time for the Las Vegas facility's prospective payment system coordinator, Lisa Casupang, and prospective payment system nurse, Kathy Manning, to visit Patel at Henderson to learn Henderson's techniques so Las Vegas could improve its performance. *Id.* Bowman did not respond to several such requests, so Luke asked Gray, as regional president, to talk to Bowman and arrange for Casupang and Manning to meet with Patel. *Id.* Luke made three requests to Gray and advised Gray that Bowman had not been responsive to Luke's repeated requests to arrange the meeting. *Id.* at 13-14. According to the complaint, Gray told Luke that it was not a good idea for Casupang and Manning to meet with Patel because Henderson used a different scoring system. *Id.* at 14.

Instead of Casupang and Manning meeting with Patel at Henderson, Patel met with the two Las Vegas staff members at the Las Vegas facility. *Id.* According to the complaint, Patel did not provide any specific information at that meeting about Henderson's methods. *Id.*

////

After repeated requests to Gray, Luke finally was able to tour Henderson, but was not permitted to meet with Patel even though he requested it. *Id.* The tour was brief and Bowman did not share Henderson's best practices with Luke. *Id.* During the tour, Luke observed two patients being transferred into the facility by gurney and all of the patients who were in their rooms were resting in their beds. *Id.* at 14-15.

Luke met with Bowman outside of work on several occasions. *Id.* at 15. During these meetings, Bowman stated it was permissible to keep patients in their beds for the first three days to obtain a lower Admit FIM score. *Id.* Bowman justified the tactic as a safety practice, but according to Luke, an arbitrary across-the-board practice of confinement to bed regardless of need was not a legitimate safety practice, and was a tactic for inflating claims, and Bowman "implied as much" during these meetings. *Id.*

Luke contends that through conversations with nurses and other workers at his facility who had previously worked at Henderson, Luke learned of the practices Henderson implemented to lower the Admit FIM score. *Id.* Specifically, Luke contends that Lura Devito, Henderson's director of therapy operations, told Luke that it was Henderson's practice to instruct its employees to transport patients from the ambulance into the facility by gurney regardless of whether the patient was capable of being transported in a wheelchair. *Id.* According to the complaint, this resulted in a lower Admit FIM score on the transferring/ambulating criteria. *Id.* Devito also told Luke that Henderson instructed its employees to keep patients in bed for the first three days of their stay regardless of need. *Id.* at 16. This would result in a lower Admit FIM score on criteria such as toileting, transferring/ambulating, bathing, dressing, and eating. *Id.*

Manning told Luke that Henderson required all newly admitted patients to receive a bed bath even if the patient could use the shower on their own. *Id.* This resulted in lower Admit FIM scores in the criteria of bathing and transferring. *Id.* Casupang told Luke that Henderson instructed its employees to watch for any signs of incontinence because only one such occurrence in the first three days is needed to score a patient as incontinent for the Admit FIM score. *Id.* Casupang advised Luke that patients are likely to spill bed pans when forced to use them,

resulting in lower Admit FIM scores for toileting and ambulating/walking. *Id.* Manning and Casupang both told Luke that Henderson also instructed its employees to round down as needed to lower the Admit FIM score on each criteria. *Id.* at 17. Luke then raised this issue with Feth, who confirmed that Healthsouth knew that Henderson had used a different scoring system. *Id.*

According to the complaint, Henderson implemented these practices regardless of each patient's actual needs or abilities in an effort to produce a fraudulently low Admit FIM score. *Id.* The complaint alleges on information and belief that Patel developed the method. *Id.* This allegation is based on Devito, Manning, and Capusang advising Luke that Patel was the one who trained Henderson staff to engage in these tactics and that Patel told Henderson staff these were safety precautions. *Id.*

Luke alleges these practices resulted in Henderson consistently submitting lower average Admit FIM scores than other Healthsouth hospitals in the west region. *Id.* at 17-18. Luke knew of these discrepancies because he received charts showing the relative performance of the various west region hospitals in his capacity as the Las Vegas chief operating officer. *Id.* at 18. For example, Henderson's Admit FIM score was approximately 30% lower than the west region average. *Id.* Henderson had a lower Admit FIM score than the average west region hospital in every single FIM criteria. *Id.* at 19-20. Additionally, the difference between Henderson's Admit FIM score and its discharge FIM (assessed 72 hours prior to the patient's discharge) was almost 57% higher than the other west region hospitals' rate of gain between the Admit and discharge FIMs. *Id.* at 19.

In his position as Las Vegas's chief executive officer, Luke also received a weekly indicator spreadsheet that included financial data. *Id.* at 20. According to the complaint, one such spreadsheet from 2012 suggests that Henderson's artificially low Admit FIM scores resulted in Henderson receiving approximately $3,100 more per patient than other west region Healthsouth facilities. *Id.* Luke suggests Healthsouth executives knew of this effect because they budgeted for (meaning they anticipated) Henderson obtaining higher reimbursement than other west region hospitals. *Id.*

Luke alleges, on information and belief, that Henderson patients were not more ill than other hospitals. *Id.* at 20-21. Luke alleges that patients are assigned to hospitals based on proximity to their homes, not based on level of care. *Id.* at 21. Thus, he asserts there is no basis to conclude that Henderson regularly should have more acutely ill patients than the other facilities in the west region. *Id.*

Luke alleges that Henderson's fraudulent practices resulting in artificially low Admit FIM scores resulted in Medicare overpaying approximately $3,100 per patient during the period of January 2008 through March 2012. *Id.* Luke alleges the practices started in approximately January 2008 when Patel became Henderson's prospective payment system coordinator because she is the one who developed the practices. *Id.* Luke alleges the practices ended in March 2012, when Bowman resigned as Henderson's chief executive officer. *Id.* In addition to allegedly submitting false claims for payment based on artificially inflated Admit FIM scores, Luke alleges Healthsouth violated the corporate integrity agreement because many Healthsouth employees knew of Henderson's fraudulent practices but did not report them. *Id.* at 23. Luke alleges that by failing to report or remedy the fraudulent practices, Healthsouth fraudulently certified to the United States that it was complying with the corporate integrity agreement. *Id.*

Based on these allegations, the complaint asserts a single count against Healthsouth under the FCA. *Id.* Although contained in one count, the complaint alleges three different FCA violations. *Id.* First, the complaint alleges Healthsouth knowingly presented and caused to be presented false claims for payment under Medicare in violation of 31 U.S.C. § 3729(a)(1)(A). Second, the complaint alleges Healthsouth knowingly made, used, or caused to be made or used false records in connection with false claims for Medicare payments in violation of 31 U.S.C. § 3729(a)(1)(B). *Id.* at 23-24. Finally, the complaint alleges Healthsouth knowingly concealed and/or improperly avoided its obligation to pay or transmit overpayments in violation of 31 U.S.C. § 3729(a)(1)(G). *Id.* at 24.

/ / / /

/ / / /

## II. ANALYSIS

In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). However, I do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the complaint. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). A plaintiff must make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Such allegations must amount to "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555.

"The FCA is an anti-fraud statute." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Consequently, an FCA complaint must be pleaded with particularity under Federal Rule of Civil Procedure 9(b). *Id.* "Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (quotation omitted). Additionally, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false.'" *Id.* (quotation omitted). In sum, the relator "must provide enough detail to give [the defendants] notice of the particular misconduct which is alleged to constitute the fraud charged so that [they] can defend against the charge and not just deny that [they have] done anything wrong." *Id.* at 999 (quotation omitted).

A relator need not "identify representative examples of false claims to support every allegation . . . ." *Id.* at 998. While pleading representative examples is "one means of meeting the pleading obligation" under Rule 9(b), it is "sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims [for payment] were actually submitted" to the United States. *Id.* at 998-99 (quotation omitted). The Ninth Circuit has disapproved of relaxing the traditional pleading standards for fraud under Rule 9(b) in FCA cases where the supporting evidence is primarily in the defendant's hands, as is

sometimes allowed in securities fraud cases. *Id.* at 999. The Ninth Circuit reasoned that "[t]o jettison the particularity requirement simply because it would facilitate a claim by an outsider is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government." *Id.*

### A. Motion to Dismiss All Defendants Except Healthsouth (ECF No. 59)

As an initial matter, Luke admits his complaint is deficient because he has alleged a claim against only Healthsouth even though other defendants are identified in the caption and in the body of the complaint. ECF No. 63 at 8. Although Luke contends I should deny the defendants' motion to dismiss as moot because this error can be corrected by an amended complaint, the proper resolution is to grant the motion to dismiss, with leave to amend. The defendants contend amendment would be futile, but I disagree. I should grant leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted); *see also* Fed. R. Civ. P. 15(a)(2) (stating leave to amend should be freely granted "when justice so requires"). Amendment could possibly cure Luke's failure to specifically assert FCA claims against each defendant. Accordingly, I grant the defendants' motion to dismiss all defendants except Healthsouth, with leave to amend.

### B. Motion to Dismiss Healthsouth (ECF No. 60)[1]

Healthsouth argues that it cannot be liable under the FCA based on its inaction in response to allegedly knowing about Henderson's alleged fraud. Rather, Healthsouth contends, it must have directly participated in the fraud.

Luke responds that this motion attacks only one of his three theories of liability, as it is directed at Healthsouth presenting or causing to be presented a false claim under § 3729(a)(1)(A). Luke argues this motion does not address his claims under § 3729(a)(1)(B) § 3729(a)(1)(G). Luke contends that as to his claim under § 3729(a)(1)(A), he has alleged Healthsouth submitted reports that did not apprise the Government of Henderson's fraudulent practices in violation of

---

[1] Gray also joined this motion. Because I have already dismissed him, I do not address him specifically. However, any amendment as to Gray should be guided by the discussion as to Healthsouth.

1   the corporate integrity agreement.  Luke argues Healthsouth's failure to report under

2   circumstances where it was contractually required to do so under the corporate integrity

3   agreement amounts to knowing assistance rather than mere inaction.  Additionally, Luke contends

4   that Healthsouth is not merely Henderson's separate corporate parent.  Rather, Healthsouth

5   entered into the corporate integrity agreement on behalf of its subsidiaries and agreed that it

6   exercised control over its subsidiaries.  Finally, Luke contends Healthsouth helped to conceal

7   Henderson's practices because Gray and other Healthsouth executives tried to prevent Luke from

8   learning about Henderson's practices.

9        In reply, Healthsouth argues that it attacked all three types of claims Luke asserts because

10  it argues all three theories require Healthsouth to act.  Healthsouth also argues the corporate

11  integrity agreement does not save the claim because the complaint does not actually allege

12  Healthsouth submitted any reports to the Government that failed to identify Henderson's

13  practices.  Healthsouth also contends it cannot be liable for an alleged failure to return or identify

14  overpayments because Healthsouth is alleged only to have failed to report suspected violations.

15  Healthsouth contends that does not establish a present duty to repay.  Healthsouth also contends

16  the complaint does not allege Healthsouth or Gray concealed the scheme.  Rather, Healthsouth

17  contends, the complaint alleges numerous Healthsouth personnel told Luke about Henderson's

18  practices.  Finally, Healthsouth argues that corporate control is insufficient because there are no

19  allegations Healthsouth controlled the alleged fraudulent scheme.

20       Section 3729(a)(1) imposes liability on "any person" who "knowingly presents, or causes

21  to be presented," a false or fraudulent claim to the United States for payment or approval. 31

22  U.S.C. § 3729(a)(1).  Section 3729(a)(1)(B) imposes liability on any person who "knowingly

23  makes, uses, or causes to be made or used, a false record or statement material to a false or

24  fraudulent claim."  Section 3729(a)(1)(G) "knowingly and improperly avoids or decreases an

25  obligation to pay or transmit money or property to the Government."

26       The Act applies to "any person who knowingly *assisted in* causing the government to pay

27  claims which were grounded in fraud, without regard to whether that person had direct

28

contractual relations with the government." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (emphasis in original, quotation omitted). Consequently, "a person need not be the one who actually submitted the claim forms in order to be liable." *Id.* On the other hand, alleging that a person who knows about another person's fraud failed to act or remained silent is insufficient to impose FCA liability. *See United States v. Murphy*, 937 F.2d 1032, 1038-39 (6th Cir. 1991); *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016) (collecting cases that mere knowledge or mere corporate parent status without some participation in the claims process or fraudulent scheme is insufficient).

Each of the three theories of liability Luke asserts, by their terms, requires some action by the defendant to be liable under the FCA. Luke contends that Healthsouth participated in the scheme by submitting reports that did not apprise the Government of Henderson's fraudulent practices in violation of the corporate integrity agreement. But the complaint does not actually allege that Healthsouth submitted reports that did not apprise the Government of Henderson's activities. However, Luke may amend to add such allegations if he has a factual basis to do so.

As to Luke's allegation that Healthsouth is more than just a parent company to Henderson, the allegations are conclusory. Luke alleges that Healthsouth "owns, controls, and exercises authority over" Henderson as "an operating subsidiary of Healthsouth." ECF No. 1 at 5. That allegation describes nothing more than a parent-subsidiary relationship. Luke also points to paragraph 70 of the complaint, which references who is a party to the corporate integrity agreement. *Id.* at 22. The parties on the Healthsouth side of the agreement are Healthsouth, all of Healthsouth's wholly owned subsidiaries (like Henderson), and any other entity furnishing health care to federal health care program beneficiaries "in which Healthsouth owns a direct or indirect equity interest of 5% or more and has the ability to control the day-to-day operations of the entity." *Id.* The reference to day-to-day control is only to identify the entities in which Healthsouth has an interest, but which are not wholly owned subsidiaries, that are subject to the corporate integrity agreement. That is not an allegation that Healthsouth controls the day-to-day activities of its wholly owned subsidiaries. However, Luke may amend to add factual allegations

to support his contention that Healthsouth acts as more than a typical parent company with respect to Henderson, or with respect to the claims process or the alleged fraudulent scheme, if he has a factual basis to do so.

Finally, Luke contends Healthsouth helped to conceal Henderson's practices because Gray and other Healthsouth executives tried to prevent Luke from learning about Henderson's practices. The complaint does not adequately allege Gray or any other executive tried to prevent Luke from learning about Henderson's practices. The only Healthsouth representatives other than Gray identified in the complaint are Glen Piche, Barbara Feth, Nina Beck, and Diane Fenstra. ECF No. 1 at 13. There are no allegations Piche did anything other than discuss Henderson's performance with Luke. ECF No. 1 at 13. The complaint alleges Feth told Luke that Henderson used a different scoring system. *Id.* The complaint alleges Beck and Fenstra acknowledged Henderson's Admit FIM scores were unreasonably low. *Id.* There is no allegation that Piche, Feth, Beck, or Fenstra attempted to dissuade Luke from learning anything.

As for Gray, the only allegations are that Gray told Luke that it was not a good idea for Casupang and Manning to meet with Patel because Henderson used a different scoring system and that Luke eventually was permitted to tour Henderson after repeated requests to Gray. ECF No. 1 at 14. This is insufficient under Rule 9(b) to plead with particularity Healthsouth's alleged role in the fraud on a concealment theory based on the allegation that one Healthsouth employee told Luke it was not a good idea for his employees to meet with Patel while simultaneously revealing an aspect of what Healthsouth allegedly was attempting to conceal and subsequently arranging for Luke to tour Henderson. That is a thin reed on which to seek to impose millions of dollars in damages and penalties on Healthsouth. However, I grant leave to amend should Luke be able to strengthen his allegations with facts sufficient to meet Rule 9(b)'s requirements on a concealment theory.

**C. Failure to State a Claim or Plead with Particularity (ECF No. 58)**

To assert an FCA claim, a relator must allege: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out

money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017). The defendants contend the complaint fails to plausibly allege each of these elements with the required particularity. Because I have dismissed the complaint as to all defendants, I need not consider these arguments. I grant Luke leave to amend to address the points raised in the defendants' Rule 9(b) motion if Luke chooses and has a factual basis to do so.

### III. CONCLUSION

IT IS THEREFORE ORDERED that the defendants' motion to dismiss **(ECF No. 59) is GRANTED**.

IT IS FURTHER ORDERED that the defendants' motion to dismiss **(ECF No. 60) is GRANTED**.

IT IS FURTHER ORDERED that the defendants' motion to dismiss **(ECF No. 58) is DENIED as moot**.

IT IS FURTHER ORDERED that relator Joshua Luke shall file an amended complaint on or before April 9, 2018. Failure to do so will result in the closure of this case.

DATED this 7th day of March, 2018.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE