JAMES J. PISANELLI, ESQ.
Nevada Bar No. 4027
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, NV  89101
Telephone:    (702) 214-2100
Facsimile:    (702) 214-2101
Email: jjp@pisanellibice.com

R. JEFFREY LAYNE, ESQ. (admitted *pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
98 San Jacinto Blvd., Suite 1100
Austin, TX  78701-4255
Telephone:    (512) 474-5201
Facsimile:    (512) 536-4598
Email: jeff.layne@nortonrosefulbright.com

*Attorneys for Defendants HealthSouth Corp.
And HealthSouth of Henderson, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, Joshua Luke,<br><br>              Plaintiff,<br><br>v.<br><br>HEALTHSOUTH CORPORATION, HEALTHSOUTH OF HENDERSON INC., KENNETH BOWMAN, JERRY GRAY, and JAYA PATEL,<br><br>              Defendants. | Case No.: 2:13-cv-01319-APG-VCF<br><br>**DEFENDANTS HEALTHSOUTH CORPORATION AND HEALTHSOUTH OF HENDERSON INC.'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** |

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), Defendants HealthSouth Corporation and HealthSouth of Henderson, Inc. ("HealthSouth Defendants") file this Motion to Dismiss the Amended Complaint of Plaintiff/Relator Joshua Luke ("Plaintiff").  Dkt. 132.

### INTRODUCTION

Plaintiff's Amended Complaint brings claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, against HealthSouth Corporation ("HealthSouth"), HealthSouth of Henderson Inc. ("HealthSouth Henderson"), and Kenneth Bowman, who was formerly the CEO at HealthSouth

Henderson (collectively, "Defendants").[1]  Plaintiff alleges that Defendants engaged in a sweeping scheme to defraud the federal government on every HealthSouth Henderson Medicare claim over a four-year period. Dkt. 132 ¶ 4. Because he is the consummate outsider unencumbered by knowledge of actual facts,[2] he fails to say anything particular about how Defendants carried out this fraud. Instead, he asks the court to do as he has done and **infer** the entire fraud of which he complains—an unreasonable and impermissible inference under Rules 8(a) and 9(b). He fails to allege fraud with the requisite particularity or state a plausible claim for relief under a cognizable legal theory under Rule 12(b)(6).

Plaintiff is not an insider. He never worked at HealthSouth Henderson and lacks any personal knowledge about HealthSouth Henderson. He will never be able to offer more than broad conclusions divorced from regulation and reality. He alleges manipulation of a clinical ability-assessment process (called "fimming" because the process results in FIM scores). Dkt. 132 ¶¶ 5, 93. As an outsider, however, Plaintiff knows nothing about how fimming is done—let alone what the regulations require of fimming clinicians or how fimming might be done fraudulently. He did not work at HealthSouth Henderson. He set foot in HealthSouth Henderson one time for a "hurried tour." He lacks all personal knowledge of HealthSouth Henderson's operations. Not once does he describe how any HealthSouth Henderson clinician assessed any patients' disabilities—appropriately or fraudulently. Instead he accuses HealthSouth Henderson clinicians of engaging in "fraudulent" treatment practices that "harmed patients" and concludes—repeatedly—that those treatments "led to" or "resulted in" "artificially low[]" FIM scores. Dkt. 132 ¶ 4. Plaintiff has no sufficient factual detail to state a plausible claim under Rule 8(a). There are no identities of specific false claims and descriptions of "particular details" of an alleged "scheme" under Rule 9(b). They are entirely absent from this complaint, which makes it insufficient as a matter of law.

---

[1]     The FCA allows individuals to file *qui tam* actions against government contractors on behalf of the federal government.  An FCA action alleges that a defendant submitted "false claims" for payment to the government.  As the *qui tam* relator, Plaintiff Joshua Luke would recover a percentage of any judgment rendered in favor of the United States—the real party in interest.  31 U.S.C. § 3730(d).

[2]     *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010) ("[T]he FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government.").

Plaintiff's only fimming allegation is that HealthSouth Henderson defrauded Medicare by using a "different scoring system" from other HealthSouth rehabilitation hospitals. Under that "different scoring system," HealthSouth Henderson clinicians allegedly "round[ed] down as needed" when "scoring" a patient's disability. As proof, he cites to HealthSouth Henderson's lower average ability scores "compared to other HealthSouth rehabilitation hospitals in the region." *See* Dkt. 132 ¶ 80. That is thin gruel. He cannot tell the Court who rounded down or on which ability measure. He cannot tell the Court for which patient. He cannot tell the Court how rounding down "as needed' is inconsistent with Medicare's instruction to assign a "score that best describes the patient's level of function." IRF-PAI Manual at III-5.

This type of fact-free, vague accusation does not satisfy Rule 9(b)'s heightened pleading standards. Plaintiff has not alleged a single example of a patient whose disability score was improperly assessed. He fails to allege any facts supporting his claim that hundreds of clinicians abrogated their clinical judgment and obligations continuously for four years. He says nothing about how Defendants were able to pressure clinicians to "manipulate the FIM process [and] hurt patients." He does not plead "the who, what, when, where, and how" of the fraudulent "scheme" to submit more than 4,700 false claims. He requires the inference of all the facts necessary to support his outlandish claims.

These are unreasonable inferences he ought not ask this court to make. It is no excuse to say "some of the information necessary to prove the allegations set out in this Complaint is exclusively in the possession of the Defendants." Dkt. 132 ¶ 22. Because he says nothing about the "who, what, when, where, and how" of the fraud he alleges, he is not entitled to rely on information allegedly in the possession of Defendants. This approach directly contravenes the Federal Rules and jurisprudence. Because he knows nothing first-hand about the Defendants, he has not pleaded sufficient facts to support his accusations against Defendants, and his claims ought not be allowed to proceed. It is unsurprising that the Government had no interest in Plaintiff's allegations and declined to intervene.

Plaintiffs' Amended Complaint should be dismissed without leave to amend.

## I.      BACKGROUND

### A.      Procedural Background

Plaintiff worked for ten months as the CEO of an Inpatient Rehabilitation Facility ("IRF") owned by HealthSouth in Las Vegas, Nevada.  Dkt. 132 ¶ 18.  Roughly one year after his employment ended, Plaintiff filed the Complaint against Defendants under the FCA's *qui tam* provisions.  Dkt. 1.  After investigating the allegations in Plaintiff's Complaint, the United States declined to intervene in this proceeding and the Complaint was unsealed.  Dkt. 9.

The Court dismissed Plaintiff's Original Complaint, finding that (1) Plaintiff had only alleged a cause of action against one of the original four defendants, and (2) HealthSouth could not be liable under the FCA based on its inaction in response to allegedly knowing about HealthSouth Henderson's alleged fraud.  Dkt. 127 ¶ at 11-12.  In response to the Court's order, Plaintiff filed an Amended Complaint.  Dkt. 132.  The Amended Complaint is essentially the same as the Original Complaint (except that the live pleading omits claims against two individuals named in the Original Complaint and corrects Plaintiff's prior failure to assert "counts" against each defendant).  *Id.*

The Amended Complaint alleges that HealthSouth Henderson engaged in a scheme to artificially decrease the "Functional Independence Measure" ("FIM") score for every patient admitted to the facility over a four-year period.  Dkt. 132 ¶¶ 3-6.  That "unlawful fimming" allegedly caused HealthSouth Henderson to misrepresent its patients' levels of disability to Medicare, which artificially increased the facility's Medicare reimbursements and led to overpayments.  *Id.*

Although Plaintiff fails to identify a single false claim (or, a single "unlawfully" fimmed patient) resulting from Defendants' alleged scheme, the Amended Complaint nevertheless attempts to allege three theories of FCA liability.  First, Plaintiff alleges that Defendants directly presented at least 4,700 false claims for payment to the federal government.  Dkt. 132 ¶ 117; 31 U.S.C. § 3729(a)(1)(A).  Second, Plaintiff alleges that Defendants indirectly used "false records" in connection with the submission of at least 4,700 false claims for payment.  Dkt. 132 ¶ 118; 31 U.S.C. § 3729(a)(1)(B).  Third, Plaintiff alleges that Defendants unlawfully concealed an "obligation" to repay the overpayments HealthSouth

4

Henderson received from Medicare as a result of the fraudulent scoring practices.  Dkt. 132 ¶ 118; 31 U.S.C. § 3729(a)(1)(G).

### B.    Regulatory Background

#### 1.    IRFs are Inpatient Facilities at Which Patients Receive High Levels of Physician Supervision and Intensive Rehabilitation Therapy

HealthSouth Henderson is a 90-bed IRF in Henderson, Nevada.  An IRF is a hospital that provides patients with intensive rehabilitation programs in an inpatient setting.  IRFs are primarily distinguished from other rehabilitation settings by both the "intensity of rehabilitation therapy services" and the "high level of physician supervision that accompanies the provision of intensive rehabilitation therapy services."  *See* Medicare Benefit Policy Manual, Ch. 1, §§ 110.2.2, 110.2.4.

Patient medical records must document that a patient "require[s] the intensive rehabilitation therapy services that are uniquely provided in IRFs."  *Id.* § 110.2.2.  Generally, a patient requires intensive rehabilitation therapy services if they need "the provision of intensive therapies at least 3 hours per day at least 5 days a week.  *Id.*  To benefit from this intensive rehabilitation therapy program, a patient's medical record must indicate "that a measurable, practical improvement in the patient's functional condition can be accomplished within a predetermined and reasonable period of time."  *Id.* § 110.3.  "The goal of IRF treatment is to enable the patient's safe return to the home or community-based environment upon discharge from the IRF."  *Id.*  To show progress toward that goal, IRF patient medical records must "demonstrate that the patient is making functional improvements that are ongoing and sustainable . . . measured against his/her condition at the start of treatment."  *Id.*

#### 2.    "FIM Scoring" ("fimming") and Medicare Reimbursement for IRF Services

CMS—the federal agency charged with administering the Medicare program—designed a special payment methodology for IRFs: the Inpatient Rehabilitation Facility, Prospective Payment System ("IRF-PPS").  IRFs send detailed reports (IRF-PAIs) to CMS regarding why their patients need rehabilitation services, as well as the conditions and disabilities their patients face.  42 C.F.R. § 412.606.  Over the first three calendar days of each patient's admission, trained clinicians design, oversee and assess the patient's performance in twenty-three different activities designed to objectively quantify the

5

extent to which the clinician believes, in her clinical judgment, a patient needs assistance (from a person or device) to complete the given activity.  IRF-PAI Manual at III-1.[3]  The clinician uses a seven-level scale (two activities are scored on a three-level scale) to quantify her assessment of the patient's abilities.

The regulations require a multi-day (not "at admission," as Plaintiff vaguely claims, *e.g.* Dkt. 132 ¶ 38) FIM scoring process driven by "experienced clinicians." IRF-PAI Manual at III-1. (Plaintiff correctly notes that fimming involving collaboration among, for example, "nurses[] and therapists." Dkt. 132 ¶ 40.) Clinicians carrying out the admission scoring activities do so during the first three days of the admission—a span of time during which the regulations also require that the patients participate in Medicare-mandated intensive therapy.  42 C.F.R. §  412.622(a)(3)(ii)  ("intensive rehabilitation therapy program generally consists of at least 3 hours of therapy (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy) per day at least 5 days per week").

The regulations instruct clinicians to assess the patients' disability through direct patient interaction, or by drawing the information from "credible reports . . . from the medical record, the patient, other staff members, family and friends."  IRF-PAI Manual at III-5.  CMS publishes highly detailed decision trees instructing clinicians on how they are to assign the numeric scores.  *See generally* IRF-PAI Manual at Section III, "The FIM Instrument." Each requires that the scoring clinician perform a clinical analysis of whether the patient can perform the activity safely, and whether the patient "needs" or "requires" assistance in performing the activity. *Id.*

CMS's IRF-PAI rules explain to IRFs how they should translate the complete set of recorded measurements gathered in the first three days of a patient's admission into eighteen "Admission FIM Scores."  IRF-PAI Manual at III-4, 5.  Anticipating that clinicians may observe the patients at different times of day, CMS instructs IRFs to record the *lowest* of the observed scores on a patient's IRF-PAI, as the "lowest level of function provides a way to measure the amount of assistance the individual requires

---

[3]     *See* The Inpatient Rehabilitation Facility Patient Assessment Instrument Training Manual ("IRF-PAI Manual") (4/01/2004), *available at* https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/InpatientRehabFacPPS/downloads/irfpaimanual040104.pdf.

from another person to carry out daily living activities." *Id.* The purpose is to record the "most dependent level" of ability, though CMS instructs the clinical team to have a "['discussion among the team members' if] there [is] a need to resolve the question of what is the most dependent level." *Id.* at III-5.

Thirteen of the eighteen FIM scores indicate motor functionality—*e.g.*, eating, toileting, locomotion—and the other five scores indicate cognitive functionality, including cognitive comprehension, social interaction, and problem solving. *Id.* at III-3, III-8.

CMS's "IRF-PPS grouper software" uses data from the submitted IRF-PAI (including a patient's Admission FIM Scores, admission medical diagnosis, and admission reason-for-therapy) to group patients into a Case-Mix Group ("CMG"). Medicare Benefit Policy Manual, Ch. 1 § 140.2.3. The CMG sets the base payment amount for an IRF admission. *Id.*; 42 C.F.R. § 412.624.

## II.    GOVERNING LAW

Plaintiff alleges that Defendants violated FCA provisions that make "liable anyone who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval,' or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Campie v. Gilead Scis., Inc.*, No. 862 F.3d 890, 898 (9th Cir. 2017) (quoting 42 U.S.C. § 3729(a)(1)(A), (B)).[4] To state a claim under those FCA provisions, Plaintiff must sufficiently plead "(1) a false statement or fraudulent course of conduct, (2) made with [] scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Id.* at 899 (quoting *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1174 (9th Cir. 2006)).

FCA claims are fraud claims, so Rule 9(b)'s heightened pleading standards apply. *Cafasso v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

---

[4]     Plaintiff's "reverse false claim" theory is based on the same alleged conduct as his other two claims; thus, Plaintiff's claim under 31 U.S.C. § 3729(a)(1)(G) is duplicative and fails for the same reasons as his other two claims. *United States ex rel. Kozak v. Chabad-Lubavitch Inc.*, No. 2:10-CV-01056-MCE, 2015 WL 2235389, at *11 (E.D. Cal. May 11, 2015).

To satisfy that standard, a Complaint must allege fraud with sufficient specificity "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001). Accordingly, pleadings must identify "'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about the purportedly fraudulent statement, and why it is false.'" *Cafasso*, 637 F.3d at 1055 (citation omitted); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 999 (9th Cir. 2010) (same).

This heightened pleading requirement serves several purposes, including "giv[ing] notice to defendants of the specific fraudulent conduct against which they must defend"; "deter[ring] the filing of complaints as a pretext for the discovery of unknown wrongs"; "protect[ing] defendants from the harm that comes from being subject to fraud charges"; and "prohibit[ing] plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Bly-Magee*, 236 F.3d at 1018 (citations omitted).

To survive a Rule 12(b)(6) motion to dismiss, plaintiffs must plead sufficient factual matter to "state a claim to relief that is plausible on its face." *Campie*, 862 F.3d at 898 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed." *United States v. My Left Foot Children's Therapy, LLC*, No. 214-CV-01786-MMD-GWF, 2017 WL 1902159, at *3 (D. Nev. May 9, 2017) (citation omitted).

## III.   ARGUMENT

### A.   Plaintiff's Complaint Does Not Satisfy Rule 9(b)

Plaintiffs' Complaint should be dismissed under Rule 9(b) because he has failed to identify a single false claim or plead particular details of a fraudulent scheme that resulted in false claims.

#### 1.   Plaintiff Has Failed To Identify A Single False Claim

To satisfy Rule 9(b), Plaintiff's fraud allegations must be specific enough so that Defendants can defend themselves against the "particular conduct which is alleged to constitute the fraud charged." *Bly-Magee*, 236 F.3d at 1019. The typical way to meet that requirement in the FCA context is to "allege with detail that a false claim was actually submitted to the government." *My Left Foot Children's*

*Therapy*, 2017 WL 1902159, at *3 (quoting *Ebeid*, 606 F.3d at 998-99); *see United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 333 (9th Cir. 2017) (rejecting Plaintiff's claim "because the FCA 'attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment'") (citation omitted); *id.* ("[A]n actual false claim is the *sine qua non* of an FCA violation.") (citation omitted).

Here, Plaintiff fails to identify a single claim submitted by HealthSouth Henderson, whether that claim was allegedly false or fraudulent.  For instance, Plaintiff does not identify a single "manipulated" Admission FIM Score. He does not describe a single instance in which a clinician improperly assessed a patient's abilities. As regards his conclusory statement that certain treatment practices "became more difficult for a patient to" perform one of the FIM activities, he does not identify  a single instance where that actually happened. Dkt. 132 ¶ 27.

In short, Plaintiff has not identified any specific false claims—much less described with any specificity who submitted the claim, when the claim was submitted, why the claim was "false," or how the claim violated a material Medicare regulation.  By omitting any allegations outlining the "who, what, when, where, and how" for any specific false claims, Plaintiff's Complaint plainly fails the primary method for satisfying Rule 9(b)'s particularity requirement.  *See Frazier ex rel. United States v. Iasis Healthcare Corp.*, 392 F. App'x 535, 537 (9th Cir. 2010) ("Although it is not mandatory that Frazier provide representative examples, such examples would go a long way in providing the necessary particularity under Rule 9(b)."); *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002) ("The False Claims Act . . . focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme.").

Plaintiff's inability to identify a single false claim only underscores that he is not an insider bringing particularized fraud allegations to light on behalf of the Government.  *Ebeid*, 616 F.3d at 999 ("[T]he FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government.").  To the contrary, Plaintiff only claims to have even visited HealthSouth Henderson on one occasion for a short tour.  Dkt. 132 ¶ 67.  Recognizing his lack of specific fraud allegations, Plaintiff tries to rationalize his pleading deficiencies by alleging that Defendants refused to give him

unfettered access to HealthSouth Henderson staff and only offered him a tour after repeated requests. *Id.* But even if Plaintiff's tour was shorter than he would have liked, Rule 9(b)'s pleading requirements apply with full force to FCA cases brought by outsiders. *Ebeid*, 616 F.3d at 999 ("To jettison the particularity requirement simply because it would facilitate a claim by an outsider is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government.").

### 2. Plaintiff Has Not Pled Particular Details Of A Scheme To Submit False Claims Or Reasonable Indicia That False Claims Were Submitted

In limited circumstances, FCA plaintiffs can satisfy Rule 9(b)—even though they cannot identify specific false claims—provided they "allege 'particular details' of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *My Left Foot Children's Therapy*, 2017 WL 1902159, at *3 (quoting *Ebeid*, 606 F.3d at 998-99). However, that standard still requires plaintiffs to plead fraud with specificity under Rule 9(b), as well as to provide enough detail to allow defendants to defend themselves from the particular misconduct which is alleged to constitute fraud. *Ebeid*, 606 F.3d at 999.

The Amended Complaint falls short of this heightened pleading standard. Rather than particularized details of a fraudulent scheme, Plaintiff has merely alleged (1) a vague, "global indictment" of Defendant's Admission FIM Scoring practices, and (2) vague, anecdotal hearsay describing certain "safety precautions" allegedly instituted at HealthSouth Henderson.

### a. Defendant's Conclusory Scheme Allegations Do Not Satisfy Rule 9(b)

Plaintiff primarily attempts to satisfy Rule 9(b) by conclusively alleging the existence of a comprehensive scheme in which Defendants fraudulently used a "different scoring system" to artificially lower the Admission FIM Scores of every patient admitted to HealthSouth Henderson over four years. Dkt. 132 ¶¶ 61, 65, 75. Plaintiff claims that the "different scoring system" allowed HealthSouth employees to "round down as needed" and lower patient scores on all 18 items used to calculate Admission FIM Scores. *Id.* ¶¶ 75, 86. He says nothing about the "the who, what, when, where, and how" of the "different scoring system." Instead, the Complaint merely assumes that Defendants' scoring

practices were fraudulent because HealthSouth Henderson's Admission FIM Scores were below average when compared to certain other IRFs owned by HealthSouth.  *Id.* ¶¶ 60-63.

But a conclusory allegation that Defendants employed a "different scoring system"—which somehow lowered Admission FIM Scores across the board and violated Medicare regulations in some unspecified manner—does not satisfy Rule 9(b).  *See United States ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1008–09 (C.D. Cal. 2015) ("While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient.") (citation omitted); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (holding that fraud allegations must "[must] identif[y] the circumstances of the alleged fraud so that defendants can prepare an adequate answer").  Indeed, just because HealthSouth Henderson's scoring methods might have been "different" (or its Admission FIM scores looked "unrealistically low") does not mean that any Medicare regulations were violated or that any false claims for payments were submitted to Medicare.

By contrast, to have satisfied Rule 9(b), Plaintiff needed to provide particular details of how HealthSouth Henderson's "different scoring system" operated, as well as the circumstances in which Defendants "round[ed] [scores] down as needed," and how "rounding down" would be inconsistent with a score that "best describes the patient's level of function." IRF-PAI Manual at III-5; *see Modglin*, 114 F. Supp. 3d at 1008 ("Conclusory allegations are insufficient, and the facts constituting the fraud must be alleged with specificity."). Without that level of detail, Defendants cannot even identify whether the alleged scheme violates Medicare regulations—let alone defend themselves against a specific fraud allegation.  For instance, "round[ing] down" could simply refer to the entirely acceptable practice of "record[ing] the lowest (most dependent) score" when a patient has "differences in function . . . in different environments or at different times of the day."  IRF-PAI Manual at III-5.

Lacking any particularized descriptions of how Defendants' "different scoring system" allowed HealthSouth Henderson to fraudulently lower Admission FIM Scores on 18 separate measures of disability, the Complaint merely pleads a "global indictment" with respect to Defendants' FIM scoring practices. *United States ex rel. McGrath v. Microsemi Corp.*, 140 F. Supp. 3d 885, 894 (D. Ariz. 2015). Such an "indictment" cannot "transform the alleged conduct into a viable cause of action under the

1   FCA," *id.*, and is precisely the "general sort" of fraud allegation that "Rule 9(b) aims to preclude."

2   *Cafasso*, 637 F.3d at 1057.

3         **b.**      **Relator's Vague, Second-Hand Anecdotes Do Not Satisfy Rule 9(b)'s**

4               **Particularity Requirement**

5         Recognizing his failure to plead any details about Defendants' overall scheme to "round down"

6   patients' Admission FIM Scores across the board, Plaintiff tries to mask his pleading deficiencies with

7   vague snippets recounting second- or third-hand hearsay regarding minor aspects of HealthSouth

8   Henderson's alleged practices.  Dkt. 132 ¶¶ 71-75.  But those anecdotes merely reinforce Plaintiff's

9   outsider status, as well as his total failure to plead particularized fraud allegations.

10         Plaintiff's hearsay allegations do not sufficiently identify "the who, what, when, where, and how

11   of the misconduct charged," or "what [was] false or misleading about the purportedly fraudulent [scoring

12   practices].'"  *Cafasso*, 637 F.3d at 1055 (citation omitted); *Ebeid*, 616 F.3d at 999.  For instance, Plaintiff

13   alleges that he heard from another employee at his hospital that HealthSouth Henderson staff had been

14   instructed to (1) "watch for any signs of an incontinent act" and (2) provide "all newly admitted patients

15   [with] a bed bath and wound check on the day after the patient was admitted."  Dkt. 132 ¶¶ 73-74.  But

16   Plaintiff does not allege how his two colleagues learned about these alleged practices at another hospital.

17   Nor does Plaintiff allege that any particular HealthSouth Henderson employees received these

18   instructions or put them into practice when caring for specific patients.  Indeed, Plaintiff does not even

19   allege which HealthSouth Henderson employees delivered these vague instructions or how the

20   instructions led to specific inappropriate actions reflected in particular Admission FIM score

21   assessments.

22         Similarly, while Plaintiff alleges that Defendants provided training on its "different scoring

23   system" to HealthSouth Henderson staff," he offers no details about the content of that training or

24   preclude the possibility that the training simply provided appropriate information about reasonable

25   safety precautions. Dkt. 132 ¶ 77.

26         Comparing Plaintiff's hearsay allegations to the first-person, insider allegations found sufficient

27   in the seminal *Grubbs* case underscores the multiple deficiencies in the Complaint.  In *Grubbs*, the

28

complaint, which was filed by an insider psychiatrist against his hospital-employer, (1) "set[] out the particular workings of a scheme that was communicated directly to the relator by those perpetrating the fraud"; (2) "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot"; (3) "alleged[] first-hand experience of the scheme unfolding as it related to him," and (4) "describ[ed] how the weekend on-call nursing staff attempted to assist him in recording face-to-face physician visits that had not occurred." *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 191-92 (5th Cir. 2009).

By contrast, Plaintiff's Complaint (1) fails to set out the particular workings of the alleged scheme, (2) lacks any details about meetings where he learned about the alleged fraudulent plot, (3) includes no first-hand experience of the scheme, and (4) contains no allegations about how the scheme was executed by specific HealthSouth Henderson personnel.   Neither Plaintiff's "global indictment" of Defendants' practices nor his scattershot hearsay allegations are sufficient to plead fraud claims with particularity under Rule 9(b).

### c.   Below Average Admission FIM Scores Do Not Provide Reliable Indicia Of False Claims

Even if Plaintiff had alleged particularized details of the alleged unlawful fimming scheme, his allegations would still fail because he had not provided "reliable indicia" that false claims were actually submitted. *My Left Foot Children's Therapy*, 2017 WL 1902159, at *3 (holding that FCA plaintiffs must "allege 'particular details' of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted").   Plaintiff has attempted to meet that burden by comparing FIM scores at HealthSouth Henderson with other facilities.   Those comparisons, however, are based on nothing more than Plaintiff's interpretation of a single chart, which covers less than a year of the alleged four-year fraud.   Dkt. 132 ¶¶ 78-86.   According to Plaintiff, those statistics show that HealthSouth Henderson's "practice of unlawful fimming, by artificially lowering the Admit FIM scores, resulted in significantly lower average Admit FIM scores" than other facilities in HealthSouth's West Region. *Id.* ¶ 78.

Those statistics are insufficient.  In *United States ex rel. Frazier v. Iasis Healthcare Corp.*, the relator alleged that the defendant healthcare provider performed medically unnecessary procedures based on statistical allegations similar to Plaintiff's here.  812 F. Supp. 2d 1008, 1017 (D. Ariz. 2011).  Like Plaintiff's comparison of HealthSouth Henderson to other facilities in the region, the *Frazier* relator alleged that "[m]ore balloon pumps were implanted [at the defendant's hospital] than any other hospital in Arizona for 2004, 2005, 2006, and 2007," and that the hospital's 400 heart surgeries per year "far exceed[ed]" the norm for a hospital of its size.  *Id.* at 1018.  The court rejected the relator's "attempt to use statistics to plead unnecessary medical procedures" because, without more, that aggregate data "fail[ed] to provide any reliable indicia that [doctors] were performing medically unnecessary procedures on federally-insured patients."  *Id.* at 1017.  Likewise, here, aggregate data regarding HealthSouth Henderson's patients cannot provide any reliable indicia that a given Medicare claim was false, much less that false claims were submitted for every Medicare patient for more than four years.  *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 66 (D.D.C. 2007) (rejecting a relator's argument that "since there is evidence of a general nature that [defendant] tried to hold patients longer than necessary, and since relator's experts opine that the average length-of-stay spiked during the . . . period in a way that is statistically significant and not random, then the Court should assume that all patients in the subject range were held too long").

## B.    Plaintiff's Unlawful Fimming Allegation Misunderstands Applicable Regulations

Equally important, Plaintiff's unlawful fimming allegation lacks particularity and plausibility because he has failed to plead sufficient facts to state a violation of the applicable regulations.  *Chesbrough v. VPA*, 655 F.3d 461, 466 (6th Cir. 2011) (holding that FCA plaintiffs "fail[ed] to plead a fraudulent scheme" when the facts alleged in the complaint would not violate applicable regulations); *United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 409 (6th Cir. 2016) (holding that courts must dismiss complaints under Rule 12(b)(6) when they state claims that are either "facially implausible or based on incorrect conclusions of law").

In particular, the Amended Complaint is premised on a fundamental oversimplification of the FIM scoring process that Medicare defines in the IRF-PAI Manual.  Contrary to Plaintiff's allegations,

1   the IRF-PAI Manual requires much more than a check-box process in which FIM scores are assigned

2   immediately at a patient's admission by a single clinician.   Instead, CMS instructs IRF clinicians to

3   design, oversee and observe patients' participation in multiple assessment scenarios over a three-day

4   period (*e.g.*, bathing one's self, getting in and out of a bed, cleaning one's self after using the toilet), or

5   to derive such ability information from other sources (such as the medical record or the patient's family).

6   IRF-PAI Manual at III-1.   The IRF-PAI recorded FIM score on any activity is the "lowest (most

7   dependent) score" for that activity assessed by one of several clinicians who may observe and measure

8   the patient's "perform[ance multiple times] during the entire 3-calendar-day admission time frame."

9   IRF-PAI Manual at III-3, 5.   Medicare instructs those clinicians to "commit[] to memory" FIM activities

10   and definitions and provides a series of "decision trees" that clinicians "follow . . . to the correct score."

11   IRF-PAI Manual at III-2, 10.

12        Plaintiff alleges that HealthSouth Henderson "treated" patients as if they were more disabled

13   than they were, and that treatment "resulted in" lower FIM scores.  Dkt. 132 ¶¶ 2, 3. But Plaintiff pleads

14   nothing at all about the FIM scoring process—that is, whether and how HealthSouth Henderson

15   clinicians and staff followed Medicare's instructions regarding measuring and scoring patients'

16   disabilities.  Nor does Plaintiff plead that clinicians scored patients based on how they performed within

17   the bounds of the alleged arbitrary treatment methods. Those omissions are telling.   If Plaintiff

18   understood Medicare's instructions regarding FIM scoring, he would know that his theory of the case is

19   factually unfounded and legally untenable.

20        For instance, each time the Amended Complaint pleads that an alleged "treatment method[]"

21   "resulted in" a lower FIM score, the Amended Complaint says nothing about who ordered allegedly

22   improper treatment; which caregivers (or, for that matter, physicians or family members) went along

23   with these treatment regimes; who measured the patient's functionality; when during the admission

24   timeframe that person scored the patient; whether that person manipulated the measurement (*i.e.*,

25   provided assistance the patient did not need and scored on that basis alone); and whether the scoring

26   recorded that clinician's measurement as the FIM score, as opposed to another clinician's measurement

27   at a different time.  Those are the particularized facts necessary to plead a scheme to manipulate FIM

28

scores, and the Amended Complaint includes none of them.  Instead, the Amended Complaint pleads a manner of treating patients, and asks this Court to infer fraud somewhere between HS Henderson's treatment of a patient and submission of the FIM score to CMS—the Amended Complaint itself does not "connect the dots."

Moreover, in other respects, the alleged "treatment methods" are legally irrelevant to FIM scored activities and, as a matter of law, could not have "resulted in" lower FIM scores. For example, a "[m]andatory bed bath" cannot affect the FIM score for "bathing," which measures the patient's ability to wash, rinse and dry ten separate areas of the body without coaxing or assistance—regardless whether the bathing is in a "tub, shower or sponge/bed bath." IRF-PAI Manual at III-15, 16.  And a "a two-person assist" from a gurney at admission could not affect a score on "transfers" because each of the "transfers" activities involves transferring from and to a specific location (bed/chair/wheelchair/tub/toilet/shower) none of which is a gurney. IRF-PAI Manual at III-33, 35, 37, 39. Because Plaintiff's claims misunderstand the regulatory background, he cannot state a claim for relief. *Chesbrough*, 655 F.3d at 466; *Sheldon*, 816 F.3d at 409.

### C.    Plaintiff's Core Allegation Lacks Plausibility And Particularity

The Amended Complaint's lack of particularized fraud allegations obscures an additional pleading deficiency:  namely, that Plaintiff's allegations involve a comprehensive scheme to harm thousands of patients and provide inappropriate patient care, while failing to allege sufficient facts to show that trained clinicians and supervising physicians acquiesced to that scheme.  Plaintiff does not merely allege a scheme to falsify Admission FIM Score documentation in order to increase Medicare payments.  Instead, Plaintiff claims that HealthSouth Henderson "cynical[ly]" "kept patients in bed for three days" and "required them to use bed pans" in order to "hurt[] patients and increase[] [its] revenue." Dkt. 132 ¶¶ 72, 91, 95.  In other words, he alleges manipulation of both care and the fimming process. Both treatment and fimming rely on clinical judgment. By failing to allege how Defendants were able to abrogate the clinical judgment of hundreds of clinicians in order to carry out a four-year scheme to harm thousands of patients, Plaintiff's scheme allegations lack plausibility and particularity.

Carrying out the alleged scheme to undermine either appropriate fimming or appropriate patient care would have required the participation or acquiescence of dozens of trained clinicians trained tasked with exercising clinical judgment while caring for and assessing the patients' disabilities (not to mention the independent physicians who "closely supervise" patient care). Rather than plead any particular details about how Defendants exerted pressure on trained clinicians to harm patients and mis-assess the patients' abilities, Plaintiff offers a summary allegation: a HealthSouth Henderson employee "trained" staff "to employ techniques to record admitted patients as being more disabled, regardless of whether they actually were." Dkt 132 ¶ 77. Compare Plaintiff's allegations to the plaintiff's in *United States v. My Left Foot Children's Therapy, LLC*, 2017 WL 1902159 (D. Nev. May 9, 2017).

Vague allegations referencing "training" and "policies and directives" do not give rise to a reasonable inference of fraud. This is a patently unreasonable inference. *Cf.*, *My Left Foot*, 2017 WL 1902159, at *3. Plaintiff must identify "the particular misconduct which is alleged to constitute the fraud charged so that [Defendants] can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019. Failing to describe any assessment-scoring scheme at all, Plaintiff fails to plead sufficient facts to state a plausible claim for relief. *Iqbal*, 556 U.S. at 678.

## IV. PLAINTIFF'S CLAIMS AGAINST HEALTHSOUTH SHOULD BE SEPARATELY DISMISSED BECAUSE THEY ALLEGE NOTHING MORE THAN "INACTION"

Plaintiff's claims against HealthSouth—the parent entity of HealthSouth Henderson—separately fail because the Amended Complaint does not allege that HealthSouth directly participated in the purported fraud. Dkt. 127 at 12-13 (granting HealthSouth's motion to dismiss the Original Complaint). As the Court previously recognized, Plaintiff's theories of FCA liability all "require[] some action by the defendant to be liable under the FCA." *Id.* at 11. Courts routinely have concluded that an FCA plaintiff must allege that a defendant took some action in presenting, or causing to be presented, a purported false claim. Mere "inaction" is insufficient. *Grubbs,* 565 F.3d at 192 (holding that [u]nder all sections" of the FCA, a defendant "must act" with the purpose of getting a false claim paid by the Government"); *United States v. Murphy*, 937 F.2d 1032, 1038-39 (6th Cir. 1991) (recognizing the need

for "some action" by the defendant "whereby the claim is presented or caused to be presented"); *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016) (collecting cases that mere knowledge or mere corporate parent status without some participation in the claims process or fraudulent scheme is insufficient).

Here, Plaintiff attempts to assert a claim against HealthSouth on three grounds. First, Plaintiff alleges that HealthSouth participated in the scheme by submitting reports that did not apprise the Government of HealthSouth Henderson's fraudulent practices in violation of a corporate integrity agreement. Dkt. 132 ¶¶ 96-101. Second, Plaintiff alleges that HealthSouth was more than a "mere corporate parent" because it somehow "knew of and controlled HealthSouth Henderson's unlawful fimming practices." *Id.* ¶¶ 102-05. Third, Plaintiff alleges HealthSouth participated in the alleged fraud by helping conceal HealthSouth Henderson's practices from Plaintiff. *Id.* ¶ 112.

The Court previously dismissed all three of Plaintiff's liability theories against HealthSouth for failing to allege sufficient facts under Rule 9(b). Dkt. 127 at 12-13. Although Plaintiff was given the opportunity to meaningfully supplement his allegations in his Amended Complaint, he has failed to do so. *Id.* Thus, Plaintiff's conclusory allegations against HealthSouth should be dismissed (for a second time) for failing to allege with particularity that HealthSouth participated in the alleged fraud.

First, although Plaintiff repeats his prior allegation that HealthSouth violated its corporate integrity agreement with the Government, the Amended Complaint again fails to allege that HealthSouth submitted any reports that omitted the alleged fraud. Dkt. 127 at 11. Plaintiff has no information about any reports HealthSouth submitted to the Government under the corporate integrity agreement—let alone any information about the content of those reports. Without any factual basis for his conclusory allegations, Plaintiff has not sufficiently alleged that HealthSouth participated in the fraud by failing to comply with its corporate integrity agreement. *Id.*

Second, the Amended Complaint's "control allegations" have "described nothing more than a parent-subsidiary relationship" and must be dismissed. Dkt. 127 at 11. Plaintiff has attempted to bolster his control allegations by conclusively alleging that HealthSouth sets policies that its subsidiary hospitals must follow. Dkt. 132 ¶ 102. In particular, Plaintiff claims that HealthSouth (1) "engages in

18

common regulatory compliance training" at its subsidiary hospitals, (2) "is responsible for the management and policies at each of its [subsidiary] hospitals, and (3) has a common compliance policy that applies to its subsidiary hospitals. *Id.* ¶¶ 103-04.

None of those conclusory allegations, however, sufficiently allege that HealthSouth controls the "day-to-day activities of its wholly owned subsidiaries," or that "HealthSouth acts as more than a typical parent company with respect to Henderson, or with respect to the claims process or the alleged fraudulent scheme." Dkt. 127 at 11-12. To the contrary, Plaintiff's entire complaint is premised on the fact that HealthSouth Henderson's "unlawful fimming" was different than the practices at any other HealthSouth facility. Thus, HealthSouth cannot possibly exercise common control of all its subsidiaries "with respect to the claims process" when HealthSouth Henderson's practices allegedly differ from every other HealthSouth subsidiary's. Because Plaintiff has failed to allege more than "mere knowledge" or "mere corporate status without some participation in the claims process or fraudulent scheme," Plaintiff's control allegations against HealthSouth Henderson are insufficient. Dkt. 127 at 11.

Third, Plaintiff's allegation that HealthSouth participated in the fraud by concealing it from Plaintiff must also be dismissed. As the Court previously recognized, Plaintiff cannot claim that HealthSouth concealed the fraud when HealthSouth personnel allegedly "reveal[ed] an aspect of what HealthSouth allegedly was attempting to conceal and subsequently arrang[ed] for Luke to tour Henderson." *Id.* Nor does Plaintiff plausibly allege that HealthSouth concealed HealthSouth Henderson's practices when the Amended Complaint elsewhere alleges that HealthSouth (1) circulated HealthSouth Henderson's FIM scores to every other subsidiary hospital in the region, Dkt. 132 ¶ 55, and (2) gave HealthSouth Henderson an award for its financial performance. *Id.* ¶ 57. By failing to "plead with particularity HealthSouth's alleged role in the fraud on a concealment theory," Plaintiff has not satisfied his burden under Rule 9(b). Dkt. 127 at 11. Plaintiff's claims against HealthSouth should be dismissed with prejudice.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**V.    LEAVE TO AMEND SHOULD BE DENIED**

"[T]he FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government." *Ebeid*, 616 F.3d at 999 (emphasis added).  By contrast, it is clear that this *qui tam* action is a fishing expedition by a wholly uninformed outsider who was unable to satisfy basic pleading requirements, and there is no reason to believe Plaintiff has anything more to add. Plaintiff has already had one opportunity to amend and failed to allege any new facts to support his claims.  Leave to amend would be futile and should be denied.  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (leave to amend should be denied where "the pleading could not possibly be cured by the allegation of other facts.") (internal quotation marks and citations omitted)).

**CONCLUSION**

For the foregoing reasons, the HealthSouth Defendants' motion to dismiss Plaintiffs' Amended Complaint should be granted with prejudice.

DATED this 23rd day of April, 2018.          Respectfully submitted,

PISANELLI BICE PLLC

*/s/ James Pisanelli*_____
JAMES J. PISANELLI, ESQ.
Nevada Bar No. 4027
400 South 7th Street, Suite 300
Las Vegas, NV 89101


NORTON ROSE FULBRIGHT US LLP

s/ *R. Jeffrey Layne*_____
R. JEFFREY LANE, ESQ.
*Admitted Pro Hac Vice*
98 San Jacinto Blvd., Suite 1100
Austin, TX  78701-4255

*Attorneys for Defendants HealthSouth Corp.*
*And HealthSouth of Henderson, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 23, 2018 a copy of this document was filed using the Court's CM/ECF system.  Copies of this document have been served by electronic means on all registered users of the Court's CM/ECF system who have appeared in this case.

*/s/ R. Jeffrey Layne*
R. Jeffrey Layne