1  Craig R. Delk (Bar No. 2295)
   CRD@thorndal.com
2  THORNDAL, ARMSTRONG, DELK
   BALKENBUSH & EISINGER
3  1100 E. Bridger Avenue
   Las Vegas, NV 89101
4  Telephone:     702.366.0622
   Facsimile:      702.366.0327
5
6  Merril Hirsh (admitted *pro hac vice*)
   merril@merrilhirsh.com
7  LAW OFFICE OF MERRIL HIRSH
   2837 Northampton St., NW
8  Washington, D.C. 20015
   Telephone:     202.448.9020
9
10 Frederick M. Morgan, Jr. (admitted *pro hac vice*)
   rmorgan@morganverkamp.com
11 Sonya A. Rao (admitted *pro hac vice*)
   srao@morganverkamp.com
12 MORGAN VERKAMP, LLC
   35 East Seventh Street, Suite 600
13 Cincinnati, OH 45202

14
15 *Attorneys for Plaintiff-Relator Joshua Luke*

**UNITED STATES DISTRICT COURT**
16 **DISTRICT OF NEVADA**
**SOUTHERN DIVISION**
17

18 | | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Joshua Luke, | Case No.  2:13-cv-01319-APG-VCF |
19 | Plaintiff, | **RELATOR JOSHUA LUKE'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT** |
20 | v. | |
21 | HEALTHSOUTH CORPORATION, *et al.* | |
22 | Defendants. | |

23        Relator Joshua Luke alleges that the Defendants committed fraud by acting as if patients
24
25 admitted to HealthSouth Henderson ("Henderson")—a HealthSouth facility in Henderson,
26 Nevada—were disabled in various respects regardless of whether they actually were.  This was
27 achieved by artificially lowering the Functional Independence Measure ("FIM") score for
28

1

admitted patients (*i.e.*, the "Admit FIM"), and the end result was a fraudulent increase in Medicare reimbursement.  (The process of obtaining a FIM score is referred to as "fimming.")

Although the Court dismissed Luke's original complaint in this action (Doc. 127), it did not rule that Luke had failed to sufficiently allege that Henderson committed this fimming fraud. To the contrary, the Court devoted a substantial part of its opinion to explaining the detailed allegations Luke asserted in his complaint.  Doc. 127 at 2-7.  Ultimately, the Court ruled that "Luke ha[d] not alleged with particularity" that Henderson's parent company, HealthSouth Corporation (the "Company"), had committed "anything more than silence or inaction coupled with knowledge of Henderson's activities" (Doc. 127 at 2) and that "Luke concede[d] he inadvertently failed to assert a claim against the other defendants."  *Id.*  Luke has filed an Amended Complaint to address the Court's concerns.  Doc. 132.

If anything, the motions that defendants Henderson, the Company, and Kenneth Bowman have now filed in an effort to dismiss this Amended Complaint (Doc. 133, 134) demonstrate that Luke has dealt with the Court's concerns.  Defendants' motions not only abandon many of the arguments they asserted in their original motion to dismiss, the new motions ignore much of what the Amended Complaint (and the Court's own presentation of the facts in its aforementioned Order) alleges.

Instead, the motions mischaracterize a few facts and pretend that these are the only facts alleged in the Amended Complaint.  Indeed, Defendants begin their brief with a demand that the Court accept that Luke—who observed many of the events alleged in the complaint while he was *the Chief Executive Officer* of HealthSouth Las Vegas (HealthSouth's own facility 16 miles away from Henderson) – is a "consummate outsider."  Doc. 133 at 2.  Then, Defendants follow with a combination of misstatements of law and various attempts to confuse the allegations, all the while failing to acknowledge the facts that give rise to liability.

As explained below, Luke's Amended Complaint sets out a plausible claim to relief, and thus satisfies Rule 8 of the Federal Rules of Civil Procedure.  It also pleads with adequate particularity the "who," "what," "when," "where," and "how" of the fraud and satisfies Rule 9(b), Fed. R. Civ. P.  Luke also pleads all of the elements of the False Claims Act ("FCA") claims in the Amended Complaint, as well as the Company's and Bowman's role in the fraud.  If the Court were to grant Defendants' motions (and, for the reasons articulated below, it should not), Luke is entitled to leave to amend his complaint.

## I.   **BACKGROUND**

The Court's Order on Defendants' original motions to dismiss sets out a detailed summary of Relator's allegations.  Doc. 127 at 2-7.  The allegations summarized by the Court remain in the Amended Complaint, and so Relator does not restate them here.

The Amended Complaint both adds allegations intended to address the concerns raised by the Court, and excludes from suit a number of defendants with respect to whom the Court expressed doubts.  As to the first category, Relator has added further detail that establishes: (1) corporate knowledge of the fimming fraud and corporate control over Henderson and Bowman; (2) a further description regarding how manipulation of the Admit FIM would affect the Medicare reimbursement amount; (3) that the fimming fraud would be material to the Government's payment decision; and (4) why the fraud matters.  As to the second category, Relator no longer seeks to impose liability against Jerry Gray and Jaya Patel, and they are excluded as defendants.

Disregarding the well-pleaded allegations in the Amended Complaint, Defendants' papers rely on matters outside of the pleadings, which we respectfully urge the Court to disregard.  Examples include assertions about Luke being an "outsider" with statements about his alleged lack of knowledge regarding Henderson and FIM scoring (Doc. 133 at 2), a description of

Henderson not otherwise in the complaint (*id.* at 5), and a discussion of the Medicare Benefit Policy Manual (*id.*; Doc 134 at 9).

## II.    ARGUMENT

### A.    The Amended Complaint Satisfies Rule 8.

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The complaint must also contain a "plausible" claim to relief—one that allows a court to "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.* at 679.  The Amended Complaint satisfies this standard.

The Amended Complaint describes the fraud scheme and identifies the players: Henderson, under the direction of Bowman as its CEO, engaged in practices that artificially lowered a patient's Admit FIM score.  Because the Admit FIM score affects the amount of Medicare reimbursement that a rehabilitation facility will receive for a particular patient, the artificially lowered Admit FIM score fraudulently inflated the Medicare reimbursement amount for a patient.  Doc. 132 at ¶¶ 37, 41-45, 91-92.

The Amended Complaint creates a more than reasonable inference that fraud occurred and that Defendants are liable for this fraud.  Not only did individuals at the Company confirm that Henderson had a fimming practice that differed from all of the other Company facilities, but Henderson employees also described specific ways that the Admit FIM was lowered and told Luke that they were instructed to obtain a low FIM score for all patients at admission.  *Id.* at ¶¶ 60-65, 69-75, 105, 107-108.  Corporate documents also corroborated that Henderson was an

outlier amongst Company rehabilitation hospitals in the region—both for its ridiculously low

Admit FIM and its unusually high per-patient Medicare reimbursement amount—and that

Henderson and the Company received Medicare reimbursements during the timeframe of the

alleged fraud.  *Id.* at ¶¶ 58, 78-87, 89, 106.

Therefore, if Luke's allegations are taken as true for purposes of a motion to dismiss (as

instructed by *Iqbal* and *Twombly*), Luke has pled more than is needed to allow this Court to

plausibly find that the Defendants are liable for the fraudulent fimming alleged in the Amended

Complaint.

**B.**      **The Amended Complaint Satisfies Rule 9(b).**

Defendants are correct that FCA actions are subject to the pleading requirements of Rule 9(b),

which requires relators to "state with particularity the circumstances constituting fraud or

mistake."  *United States v. United Healthcare Ins. Co., Inc.*, 848 F.3d 1161, 1180 (9th Cir.

2016)(citing Fed. R. Civ. P. 9(b)).  To satisfy the Rule 9(b) standard, a relator must identify the

allegedly fraudulent conduct, as well as the "who, what when, where, and how" surrounding the

fraud.  *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  This ensures

that defendants are given adequate notice of the allegations brought against them and are able to

adequately defend themselves against those allegations.  *Id.* at 999.

However, contrary to Defendants' argument, a complaint need not contain "facts

supporting each and every instance of fraud over a multi-year period."  *United States ex rel.

Welch v. My Left Foot Children's Therapy, LLC*, 2017 U.S. Dist. LEXIS 70680, *10 (D. Nev.

May 9, 2017).  Nor does Rule 9(b) require that a relator allege "representative examples of false

claims" in order to satisfy these pleading requirements.  *Ebeid*, 616 F.3d at 998.

A complaint does not need to identify "a precise time frame," "describe in detail a single

specific transaction," or "identify the precise method used to carry out the fraud."  *United*

*Healthcare*, 848 F.3d at 1180.  Rather, it is enough for a relator to allege the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99 (quoting *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

Moreover, "neither the FCA nor Rule 9(b) mandates that a relator possess personal knowledge of the alleged fraud." *United States ex. rel.  Compton v. North Carolina Baptist Hospital*, No. 1:09-cv-420, 2016 WL 7471311, at *13-14 (M.D.N.C. Dec. 28, 2016).  Those details may either come from the relator's personal knowledge of the scheme or be established through the testimony of others. *Scott v. Ariz. Ctr. for Hematology & Oncology PLC*, 2018 U.S. Dist. LEXIS 37927, *12 (D. Az. Mar. 8, 2018).

The need to provide information "linking defendants to the scheme" also does not impose a massive burden. *United Healthcare*, 848 F.3d at 1182.  Allegations that name the defendants (the "who"), outline the fraudulent scheme (the "what"), describe a general timeframe (the "when"), and indicate the place and manner in which the scheme was carried out (the "where" and "how") are enough to satisfy Rule 9(b)'s pleading requirements.  *Id.* at 1181.

Nor does presenting "reliable indicia" that fraudulent claims were submitted require a relator to have worked in a billing department or attach actual claim forms to his complaint.  *See United States v. Somnia*, 2018 U.S. Dist. LEXIS 17667, *22-23 (E.D. Cal. Feb. 2, 2018)(describing how such a strict requirement would allow fraudulent actors to avoid liability and "discourage the filing of meritorious *qui tam* suits")(citing *U.S. ex rel. Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 86 (2d Cir. 2017)).  It is enough for a relator to present evidence that allows the court to draw a "strong inference that at least some of the claims…were submitted to the government for payment." *Id.* at *23 (inferring fraudulent claims based on Medicare patient population). *See also United Healthcare*, 848 F.3d at 1181

(inferring fraudulent claims based on the nature of the scheme to manipulate claims data); *My Left Foot*, 2017 U.S. Dist LEXIS at *17-18 (inferring fraudulent claims based on Medicaid/Tricare population); *United States ex rel. Jajdelski v. Kaplan, Inc.*, 517 Fed. Appx. 534, 536 (9th Cir. 2012)(stating that "[i]t would stretch the imagination to believe that Kaplan employees fastidiously (and secretively) documented fake student enrollment statistics…only for the scheme to deviate…at the last moment such that they did not submit those claims to the Department of Education").

Despite Defendants' repeated assertions to the contrary, the Amended Complaint satisfies Rule 9(b).  It presents the "who," the "what," the "when," the "where," and the "how" of the alleged fimming fraud and provides reliable indicia from which the Court can infer that claims were submitted to Government healthcare programs.  Defendants, however, ignore much of the information alleged in the Amended Complaint, so Luke now identifies those allegations that satisfy Rule 9(b) for the Court.[1]

---

[1]  Defendants argue that Luke's conversations with former Henderson employees are hearsay, so cannot be relied upon when considering the plausibility of Relator's claims.  They further argue that more information about the details of those conversations and the employees themselves are required in order to determine whether they bring credible information to bear on the allegations in the Amended Complaint.  In fact, as these were statements by a party opponent's employees about matters within their employment, they are not hearsay to begin with.  *See* Fed. R. Evid. 801(d)(2)(A) and (D).  In any event, hearsay is an evidentiary concept that is reserved for trial; there is no place for it at the motion to dismiss stage.  *See Amalgamated Transit Union Local v. Spokane Transit Auth.,* No. 17-cv-00053-JLQ, 2017 U.S. Dist. LEXIS 74527, at *15 (E.D. Wash. May 16, 2017)("the fact that the Complaint relies on hearsay is immaterial in a motion to dismiss)(citations omitted); *Shepard v. Shinseki*, 2014 U.S. Dist. LEXIS 20562, *9 (D. Nev. Feb. 19, 2014)("Evidence presented at the motion to dismiss stage can contain hearsay, for example, yet still be appropriately considered by the court if it can be presented at trial in an admissible format (for example, with testimony)")(internal citations omitted).

Similarly, credibility determinations are inappropriate at this stage of litigation.  *See Lehman Bros. Holdings, Inc. v. Wembley's, Inc.*, No. cv-12-8538-MFW, 2014 U.S. Dist. LEXIS 197654 *4-5 (C.D. Cal. March 4, 2014)(rejecting argument that the amended complaint is based on facts from "not credible witnesses" because "[t]he Court may not make any credibility determinations at this stage"); *Wool v. Sitrick*, 2010 U.S. Dist. LEXIS 148305, *29-30 (E.D. Ca.

1

## 1.    Relator Alleges The "Who."

Relator has clearly identified the individuals involved in the fraudulent fimming alleged in the Amended Complaint.  First, Defendant Henderson, the facility that had a policy to keep patients in bed for three days upon admission, which resulted in admitted patients being rolled in on gurneys instead of walking and being forced to use bedpans instead of the toilet.  Doc. 132 at ¶ 74.  All of this was done to lower the Admit FIM score and increase reimbursement from Medicare.  *Id.* at ¶ 76.

Next, Defendant Bowman.  He was the CEO of Henderson, and, as such, it was his responsibility to oversee all functions of Henderson, including billing and admission procedures.  *Id.* at ¶ 21.  He directed and oversaw the aforementioned fraud scheme to artificially lower Admit FIM scores (by requiring patient admissions to be brought in on a stretcher and then remain in bed for three days), and it was on his watch that it was implemented.  *Id.* at ¶ 69.  As a result of that fraud, Medicare reimbursement went up, Henderson's revenue increased, and Bowman reaped the rewards that the Company bestowed upon him.  *Id.* at ¶ 111.

The Amended Complaint also identifies the individual that Bowman tasked with implementing the fraudulent fimming at Henderson: Jaya Patel, Henderson's Prospective Payment System Coordinator, who reported to Defendant Bowman.  *Id.* at ¶ 60.  Under Bowman's direction, Patel was responsible for training the Henderson staff on the fraudulent fimming procedures.  *Id.* at ¶ 61.

---

Aug. 10, 2010)("[O]n a motion to dismiss, the Court may not render credibility determinations as to the weight of evidence. Rather, the Court must accept as true all factual allegations in the [Amended Complaint] and construe them in the light most favorable to Plaintiffs"); *Robert Kubicek Architects & Assocs. v. Bosley*, 2009 U.S. Dist. LEXIS 90628 (D. Az. Sep. 21, 2009)("Even at summary judgment, the Court must defer credibility determinations to the jury. The Court's role on a motion to dismiss is merely to determine whether the claims asserted are sufficiently pled").

Finally, the Amended Complaint identifies a fourth "who": the Company.  Luke discussed Henderson's and Bowman's fimming practices with Defendant HealthSouth executives, including Gray, the Regional President for the West Region and Luke's (and Bowman's) immediate supervisor; Barbara Feth, the Company's Director of Therapy for the West Region and Associate National Director of Therapy Operations; Glen Piche, the Company's Regional Director of Marketing Operations; Nina Beck, Chief Financial Officer for the West Region; and Diane Fenstra, Regional Business Office Manager for the West Region.  *Id.* at ¶¶ 60-62, 107.  Those individuals acknowledged that Bowman and Henderson used a different fimming practice, that they had been told to cease the utilization of that practice, and that Henderson had unrealistically low FIM scores.  *Id.*  These conversations, in conjunction with internal documents, indicated that the fimming practices did not cease and that Henderson continued to be an outlier among the Company's facilities in the West region in terms of, *inter alia*, average admit FIM score and Medicare revenue.  *Id.* at ¶¶ 78-87, 108.  Far from ensuring that the fraud stop, the Company counted on the revenue brought in by Henderson as a result of the fraudulent fimming.  *See id.* at ¶¶ 87, 92.

### 2.    Relator Alleges The "When" And "Where."

The Amended Complaint also sets forth the "when" and "where" of the alleged scheme. Paragraph 9 of the Amended Complaint (Doc. 132) asserts that the unlawful fimming practices at Henderson took place "from approximately January 2008 until at least March 2012…"  *See also id.* at ¶ 90.  In numerous paragraphs, the Amended Complaint identifies Henderson as the place where the fraud occurred.  *See, e.g., id.* at ¶¶ 60-62, 70-76.

### 3.    Relator Alleges The "What" And "How."

The Amended Complaint adequately pleads the "what" and the "how" of the fimming fraud at Henderson; it clearly sets out what the fraud was and how it worked.  The Amended

Complaint describes how Medicare reimbursements for rehabilitation hospitals are calculated, noting that the Admit FIM score is an integral first step to determining that reimbursement number, and describes how the reimbursement amount increases as the Admit FIM score decreases. *Id.* at ¶¶ 41-45. That is the lynchpin of the fraud.

But Luke goes on to describe how Bowman and Henderson executed the fraud. Under Bowman's direction, Patel trained the Henderson staff to follow a policy that required patients to be brought into the facility with assistance (a stretcher, for example) and mandated that those patients stay in bed for the first 72 hours after admission. *Id.* at ¶¶ 71-72. This allowed staff to lower the Admit FIM score on a variety of FIM items. For example, if patients are not allowed to get out of bed, they cannot use the toilet and must use a bed pan—that results in a lower score for toileting. *Id.* at ¶ 72. If the patient is confined to their bed, they cannot put clothes on or feed themselves as independently—that would allow for a lower score on the FIM items of feeding and dressing. *Id.* at ¶ 72. This practice of achieving a lower Admit FIM score by virtue of the fact that a patient was stuck in bed, rather than measuring a patient's true abilities, was executed across the board for all patients admitted to Henderson. *Id.* at ¶ 76.

Luke's allegations include information about conversations with Henderson employees and Company executives, as well as documents showing the unrealistically low Admit FIM scores at Henderson and the resulting unrealistically high per-patient Medicare reimbursement for Henderson patients. *See, e.g., id.* at ¶¶ 70-75 (conversations with Henderson employees), ¶¶ 60-62 (conversations with Company executives, including Bowman), ¶¶ 78-87 (regarding information in corporate documents).

The Company and Henderson argue that Luke has failed to show how Defendants got all of the clinicians at Henderson to agree to engage in the fraud. This is a non sequitur. Luke is not alleging that all of Henderson's employees were knowingly complicit in the fraud, nor is he

alleging that clinicians provided medically unnecessary therapy to patients during rehabilitation. The fraud alleged in this case is very simple—the nurses, aides, and physical therapists (with or without an understanding that they were committing fraud) were trained by Patel, under Bowman's direction, to implement practices that artificially lowered the Admit FIM scores for patients admitted to Henderson.  Based on that practice alone—*i.e.*, artificially lowering the Admit FIM scores—Bowman and Henderson were able to increase Medicare reimbursement.

Indeed, Henderson's and the Company's own brief explains why this works: as they point out, the Company's approach was to use "the *lowest*" Admin FIM number chosen by anyone who observed an admitted patient during the first three days.  Doc. 133 at 6 (emphasis in the pleading). Accordingly, it would not matter how many clinicians recognized during those 3 days that a patient did not need a bedpan; it would take only one clinician to obtain a FIM score based on the fraudulent fimming policy that mandates a bedpan whether or not one is needed.[2]

The Company was aware that Bowman had implemented these different fimming procedures at Henderson, but they were also aware that the practices brought in increased revenue from Medicare.  So they allowed it to happen and took the resulting extra Medicare dollars.

**4.    Reliable Indicia Lead To An Inference That Medicare Claims Were Submitted.**

Contrary to Defendants' arguments, Luke need not identify actual claims that were submitted to Medicare as a result of the alleged fraud.  Rather, it is enough for a relator to allege

---

[2] Elsewhere, *id.* at 15, Defendants confuse the case in a different way by trying to turn it into a dispute over "improper treatment."  The fimming fraud that the Amended Complaint alleges does not require that Defendants bill for treatment that patients did not need.  HealthSouth and Henderson received their Medicare money based on a "prospective payment system" that set reimbursement rates based on the patient's Admit FIM, regardless of what treatment Defendants went on to provide.  Mark a patient as being unable to go to the bathroom by herself, and the Defendants receive money as if the patient is disabled in this manner, regardless of whether they ever attempt to "treat" this infirmity.

the "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99.  The Amended Complaint clearly permits this inference, and it is the only reasonable inference to draw from Relator's allegations.

As previously noted, the Amended Complaint sets out the fraudulent fimming scheme, which was applied as a matter of course for virtually all Henderson admissions, and discusses how the Admit FIM affects the amount of Medicare reimbursement.  The Amended Complaint also discusses the corporate documents given to Luke that show the unrealistically low Admit FIM scores for Henderson and, importantly, incredibly high per-patient Medicare reimbursement numbers for the facility.  *Id.* at ¶¶ 78-87.  In showing the Medicare reimbursement numbers that made Henderson an outlier in terms of per-patient reimbursement, the Company's 2012 Spreadsheet confirmed that claims were submitted to the Medicare program. Thus, the Company's own documents show that claims resulting from Defendants' fraud scheme were submitted to Medicare. Combined with, *e.g.*, statements from Defendant Bowman and others asserting that increased Medicare reimbursement resulted from Defendants' 72-hour bed policy, only one inference is reasonable: Defendants submitted or caused the submission of false claims to Medicare.  No claim form is needed, and to suggest otherwise ignores the standard in this Circuit.

**C.    Defendant Bowman's Arguments Are Misplaced.**

**1.    Relator Adequately Pleaded Bowman's Knowledge.**

In his motion to dismiss, Defendant Bowman asserts that Relator "fails to plead the essential element of FCA knowledge" against him.  Doc. 134 at 27.  At the outset, it must be noted that Rule 9(b) does not require Luke to plead the knowledge element with particularity. The Rule specifically states that "knowledge, and other conditions of a person's mind may be

alleged generally." Fed. R. Civ. Pro. 9(b). Because the Amended Complaint contains the assertion that Bowman acted knowingly when he engaged in the fraudulent fimming scheme, it satisfies Rule 9(b)'s requirement.

Nevertheless, the Amended Complaint goes further. Not only does the Amended Complaint allege that Bowman, as CEO, oversaw all functions of Defendant Henderson and directed its policies and practices, but it also states that Bowman admitted to Luke that he had a policy to keep patients in bed for their first 72 hours in Henderson and that this policy increased Medicare reimbursement. Doc. 132 at ¶ 69. Furthermore, as a Company CEO, Bowman received the same corporate documents and data that Luke did, so would have knowledge about the effect of the fimming practices that he implemented.

Curiously, Bowman tries to frame the three-days-in-bed rule as a mere interpretation of a "disputed legal question." In doing so, Bowman relies heavily on *Hagood v. Sonoma Cnt. Water Agency*, 81 F.3d 1465 (9th Cir. 1996). *Hagood*, however, is inapposite; the case was in a different procedural posture (the *Hagood* court was faced with a summary judgment appeal), so the Court applied a different analysis.

On the other hand, applicable caselaw supports Relator's position that falsely representing patient data that is used to determine the amount of Medicare reimbursement is clearly an actionable theory under the FCA. *See United States ex rel. Lupo v. Quality Assur. Servs.*, 2017 U.S. Dist. LEXIS 117189 (S.D. Cal. Jul. 26, 2017)(citing *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001)).

Relator is not required to prove Defendant Bowman's knowledge at this stage—he is only required to have adequately pled it generally. If Defendant Bowman wishes to take a head-in-the-sand defense as the case progresses, he is of course free to do so. But that is not a proper analysis for the Court on a motion to dismiss.

### 2.  Relator Adequately Pleaded Materiality.

Bowman also argues that the Amended Complaint must be dismissed because it fails to plead the element of materiality and cites *Universal Health Services v. United States ex rel. Escobar*, 136 S.Ct. 1989 (2016) as support.  *Escobar* focused on the requirement that the alleged falsity or fraud in FCA cases be material to the Government's decision to pay a claim. Materiality is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* at 2002.

Materiality can be complicated in some cases of implied certification, but it is straightforward here.  As the Amended Complaint clearly states, the Admit FIM scores at issue here do not merely influence Medicare payments in some amorphous way; they are used to *actually* set the amount of those payments.  *Id.* at ¶¶ 37-45.  The FIM scores factor directly into the calculation used to determine reimbursement to a rehabilitation facility, such as Henderson.  It is clear that the lower the Admit FIM score for a patient, the higher the Medicare reimbursement will be to the facility.  *See id.*  Nothing could be more material to a payment decision.

### 3.  Relator May Plead More Than One FCA Count.

Bowman also argues that Luke's claim concerning improper retention of Government overpayments under 31 U.S.C. § 3729(a)(1)(G) must be dismissed because it is duplicative and does not provide a separate ground for relief.  Not only does Bowman ignore that claims under the various sections of the FCA require proof of different elements, but Rule 8(a)(3) contemplates that "a demand for the relief sought…may include relief in the alternative."  Accordingly, the overpayment claim in the Amended Complaint should not be dismissed.

### D.    Relator Adequately Pleaded HealthSouth's Role In The Fraud.

Defendant HealthSouth argues that Luke did not adequately plead the Company's role in the fraudulent fimming because (1) Luke cannot demonstrate that it did not notify the

14

Government of the alleged fraud, as required by the Corporate Integrity Agreement ("CIA") it was under; (2) the Company is merely a parent with no control over its hospitals; and (3) the Company did not conceal the alleged fraud from Luke.

The Amended Complaint does allege that the Company did not report the fimming fraud at Henderson and asserts that the Company's failure to do so is a violation of the terms of the CIA and could be construed as a violation of the FCA.  If the Company is asserting that it did properly report the fraud, Relator is willing to accept the admission.  But that would not absolve the Company of FCA liability and, regardless of whether the Company complied with its obligations under the CIA, the fact that the Company is subject to a CIA is evidence of its knowledge of the legal requirements to operate in the healthcare industry, as well as its intent to violate the law.

Furthermore, while the Company cites general law to push the contention that parent companies are not automatically liable for their subsidiaries, it does not contradict that it exercised control over Henderson, as the Amended Complaint alleges.  And, the Company *did* exercise control over Henderson and Bowman.  As alleged in the Amended Complaint, the Company: collected data on all of its rehabilitation hospitals (including Henderson) and distributed the information amongst all of the Company's CEOs; provided oversight of facilities (*e.g.*, Gray visited the hospitals in his territory); subjected its facilities to corporate policies, procedures, and training; and had the authority to hire and fire (and award) the CEOs of its facilities.  *See, e.g.,* Doc. 132 at ¶¶ 78-87, 102-111.

Finally, whether or not the Company tried to hide the fraudulent fimming from Luke is not dispositive of liability: The FCA contains no element that the defendant have hidden the fraud from a relator.  However, hiding fraud—successfully or not—is evidence of liability.

### E.    The Government's Intervention Decision Is Not Relevant.

In virtually every substantive pleading that has been filed by Defendants in this case, they

make much ado about the United States' decision to not intervene in this action.  This ploy is a red herring and should be put to rest.  The law is clear on this point: the Government's decision not to intervene in a *qui tam* action should not be construed as an indication that it believes a relator's claims are without merit.  *See United States, ex rel. Chandler v. Cook County, Illinois*, 277 F.3d 969, 974 n. 5 (7th Cir. 2002)("There is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits"); *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 fn. 17 (11th Cir. 2006)("We do not assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient or the qui tam relator's allegations for fraud to be without merit"); *United States ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 457 (4th Cir. 2011)("The government's decision not to intervene in an FCA action does not mean that the government believes the claims are without merit").  Defendants point to no authority to the contrary and instead rely on a hope that the Government's nonintervention decision will somehow emotionally sway this Court's decisions.  This approach to litigation should not be countenanced.

### F.     <u>Relator Should Be Given Leave To Amend If Necessary.</u>

Should the Court grant Defendants' motions to dismiss, Luke respectfully requests that he be granted leave to amend his complaint.  "The Ninth Circuit consistently ha[s] held that leave to amend should be granted unless the district court determines that the pleading could not possibly be cured by the allegation of other facts."  *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001)(citation omitted).  Federal Rule of Civil Procedure 15(a) also provides that "[t]he court should freely give leave when justice so requires."  Leave to amend is especially appropriate where, as here, there has been no delay, bad faith, or dilatory motive, and there would be no prejudice to the defendants.  *Foman v. Davis*, 371 U.S. 178 (1962); *Fish, et al. v. Greatbanc Trust Co., et al.*, 749 F.3d 671 (7th Cir. 2014).

1  Defendants argue that amendment would be futile because Luke is an "outsider" who

2  cannot provide information about the Company, Henderson, or Bowman.  This characterization of

3  Luke disregards the fact that Luke was one of the Company's CEOs.  In that capacity, he had

4  access to corporate documents, Company executives, and Bowman.  Furthermore, he operated a

5  Company rehabilitation hospital that neighbored Henderson, so he knows the rules and

6  regulations, policies and procedures that are applicable to facilities like Henderson.  It is simply

7  disingenuous to call Luke an "outsider."

8

9  **III.    CONCLUSION**

10  For all of the foregoing reasons, Luke respectfully requests that the Court deny

11  Defendants' motions to dismiss the Amended Complaint.  In the alternative, Relator requests that

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   the Court grant him leave to amend the complaint.

2   Dated: May 7, 2018                    Respectfully submitted,

3

4                                         /s/ Sonya A. Rao

5                                         CRAIG R. DELK (Bar No. 2295)
                                          CRD@thorndal.com
6                                         THORNDAL, ARMSTRONG, DELK
                                          BALKENBUSH & EISINGER
7                                         1100 E. Bridger Avenue
                                          Las Vegas, NV 89101
8                                         Telephone:     702.366.0622
                                          Facsimile:     702.366.0327
9

10                                        MERRIL HIRSH (*pro hac vice*)
                                          merril@merrilhirsh.com
11                                        LAW OFFICE OF MERRIL HIRSH
                                          2837 Northampton St., NW
12                                        Washington, D.C. 20015
                                          Telephone:     202.448.9020
13

14                                        FREDERICK M. MORGAN (*pro hac vice*)
                                          rick.morgan@morganverkamp.com
15                                        SONYA A. RAO (*pro hac vice*)
                                          sonya.rao@morganvekamp.com
16                                        MORGAN VERKAMP LLC
                                          35 East Seventh Street, Suite 600
17                                        Cincinnati, OH 45202
                                          Telephone:     513.651-4400
18
                                          *Attorneys for Plaintiff-Relator Joshua Luke*
19

20

21

22                      **CERTIFICATE OF SERVICE**

23          I hereby certify that a copy of the foregoing was sent via the Court's electronic filing
24   system, and served on all counsel of record on May 7, 2018.

25                                        /s/ Sonya A. Rao
                                          Sonya A. Rao
26

27

28