# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA ex. rel. JOSHUA LUKE,<br><br>Plaintiff<br><br>v.<br><br>HEALTHSOUTH CORPORATION, et al.,<br><br>Defendants | Case No.: 2:13-cv-01319-APG-VCF<br><br>**Order (1) Granting in Part Motions to Dismiss; (2) Overruling Objections to Magistrate Judge's Order; and (3) Denying Emergency Motion to Stay**<br><br>[ECF Nos. 133, 134, 146, 147] |

Defendants Healthsouth Corporation (Healthsouth), Healthsouth of Henderson, Inc. (Henderson), and Kenneth Bowman (Bowman) filed two motions to dismiss. ECF Nos. 133, 134. Generally, the defendants argue that the amended complaint fails to adequately allege a claim under the False Claims Act (FCA) pursuant to Federal Rule of Civil Procedure 9(b)'s particularity requirement. Additionally, Healthsouth asserts that the complaint fails to state a claim against it because mere knowledge of someone else's alleged FCA fraud (in this case, Henderson's) is insufficient to impose liability. Bowman asserts that the amended complaint fails to plead knowledge as to him and that any conduct occurring at Henderson before he started working there should be dismissed as to him.

Relator Joshua Luke responds that the complaint adequately sets forth a fraudulent course of conduct by which Henderson manipulated its evaluation of the dependency level of incoming patients and intentionally misrepresented the patients' disability ratings regardless of the patients' actual capabilities. Luke alleges that Henderson did so to report lower Functional Independence Measure (FIM) scores to the Department of Health and Human Services (DHHS), Center for Medicare and Medicaid Services (CMS). According to Luke, CMS uses the FIM

score to determine what services a facility like Henderson is expected to provide to patients, and thus CMS bases the amount of prospective Medicare payments that it will pay in part on the FIM. The lower the FIM, the higher the reimbursement payment. Luke contends Henderson successfully implemented its plan, resulting in an overall higher rate of reimbursement compared to other Healthsouth facilities in the region. Luke contends he has adequately alleged that Healthsouth knew of the fraud and failed to report it as required under a corporate integrity agreement with the United States and that Healthsouth otherwise sufficiently controlled Bowman and Henderson such that it was involved in the fraud. Luke asserts he has adequately alleged knowledge as to Bowman because knowledge can be alleged generally and he has alleged Bowman admitted he had a policy that resulted in increased Medicare reimbursements.

**I.  BACKGROUND**

Healthsouth operates rehabilitation hospitals through subsidiary companies. ECF No. 132 at 5, 11. Henderson is one such subsidiary that is an inpatient rehabilitation facility. *Id.* at 5-6. Bowman was Henderson's chief executive officer from 2009 to February 2012. *Id.* at 6. Luke was the chief executive officer of Healthsouth Rehabilitation Hospital of Las Vegas, another of Healthsouth's facilities, from September 2011 to July 2012. *Id.* at 5. Healthsouth operated fourteen such hospitals in the west region, which includes the Henderson and Las Vegas facilities, during the relevant time period. *Id.* at 11-12.

According to the amended complaint, in January 2005 Healthsouth entered into a corporate integrity agreement with the DHHS's Office of Inspector General. *Id.* at 21-22; ECF No. 132-1. That agreement covers Healthsouth and all of its wholly owned subsidiaries that provide rehabilitation hospital services. ECF No. 132 at 23. Under the agreement, Healthsouth was required to prepare a code of conduct and establish a compliance program designed to

prevent violations of any federal healthcare program, including requiring all Healthsouth employees to comply with all federal healthcare program requirements and to report to a compliance officer any suspected violations. *Id.* at 23-24. The program includes a requirement to report overpayments. ECF No. 132-1 at 30. According to the amended complaint, Healthsouth "was aware of, but did not disclose or prevent" Henderson's fraudulent practices. ECF No. 132 at 24.

Under Medicare Part A, the United States reimburses inpatient rehabilitation facilities like Henderson based on the amount of resources the facility is expected to expend on a Medicare beneficiary's rehabilitation under a prospective payment system. *Id.* at 9. That prospective payment system requires the facility to use a patient assessment instrument to evaluate each incoming patient's disability level upon admission to the facility. *Id.* To do so, the facility's staff uses the FIM scoring system to determine an Admit FIM score, which essentially is a disability rating. *Id.* The score is based on both physical and mental abilities, including grooming, toileting, eating, and dressing. *Id.* at 9-10.

Those scores are then used to assign the patient to a case-mix group and to different tiers depending on the severity of comorbid disorders. *Id.* at 10. Each case-mix group and tier combination is given weight aimed at representing the anticipated resources the facility will expend to rehabilitate that patient. *Id.* at 10. CMS, which administers this Medicare program, then takes that relative weight and multiplies it by a conversion factor to determine the amount the United States will prospectively pay the facility. *Id.* CMS also adjusts the payment based on factors such as if the patient's stay at the facility was interrupted or if the facility is located in a rural area. *Id.* at 10-11. The amended complaint alleges that inpatient rehabilitation facility staff input the FIM data directly into software that CMS then uses for payment purposes. *Id.* at 11.

3

Luke alleges that the Admit FIM score impacts the prospective reimbursement amount because the lower the Admit FIM score, the higher the likely reimbursement. *Id.* at 2-3. Thus, if a facility falsely exaggerates a patient's disabilities to generate a low Admit FIM, it may result in a fraudulently inflated reimbursement amount. *Id.* Luke alleges Henderson engaged in a fraudulent course of conduct to artificially lower Admit FIM scores for all incoming patients as more fully described below.

Luke alleges that within a few months after starting his position at the Las Vegas facility, he reviewed financial data for Healthsouth facilities in the west region and noted that Henderson regularly was the highest financial performer. *Id.* at 12. Luke also noticed that Henderson's overall Admit FIM score was consistently significantly lower than other hospitals in the west region in 2011 and 2012, including facilities that were only about 15 miles away. *Id.* at 12-13. Luke began to investigate this anomaly. *Id.*

At a February 2012 regional meeting, Luke spoke to Barbara Feth, who serves as Healthsouth's regional director of therapy operations for the west region and as the associate national director of therapy operations. *Id.* at 13. Feth allegedly told Luke that Henderson, under the direction of Bowman and Jaya Patel (the prospective payment system coordinator for Henderson), was using a different scoring system than other Healthsouth facilities. *Id.* Luke alleges that at this same meeting, he spoke with Glen Piche (regional director of marketing operations), Nina Beck (chief financial officer for the west region), and Diane Fenstra (region business office manager for the west region). *Id.* at 13-14. According to Luke, Beck and Fenstra both acknowledged that Henderson's Admit FIM scores appeared unrealistically low. *Id.* at 14.

Luke reached out to Bowman to schedule a time for the Las Vegas facility's prospective payment system coordinator, Lisa Casupang, and prospective payment system nurse, Kathy

4

Manning, to visit Patel at Henderson to learn Henderson's techniques so Las Vegas could improve its performance. *Id.* Bowman did not respond to several such requests, so Luke asked Jerry Gray, the regional president for the west region, to talk to Bowman and arrange a meeting. *Id.* Luke made three requests to Gray and advised Gray that Bowman had not been responsive to Luke's repeated requests for a meeting. *Id.* at 13-14. According to the amended complaint, Gray told Luke that it was not a good idea for Casupang and Manning to meet with Patel and that Henderson used a different scoring system than other Healthsouth rehabilitation hospitals in the region. *Id.*

Instead of Casupang and Manning meeting with Patel at Henderson, Patel met with the two Las Vegas staff members at the Las Vegas facility. *Id.* at 15. According to the complaint, Patel did not provide any specific information at that meeting about Henderson's methods. *Id.*

After repeated requests to Gray, Luke finally was able to tour Henderson, but was not permitted to meet with Patel even though he requested it. *Id.* The tour was brief and Bowman did not share Henderson's practices with Luke. *Id.* During the tour, Luke observed two patients being transferred into the facility by gurney and all of the patients who were in their rooms were resting in their beds. *Id.*

Luke met with Bowman outside of work on several occasions. *Id.* at 15. During these meetings, Bowman stated it was permissible to keep patients in their beds for the first three days to obtain a lower Admit FIM and thereby increase profits. *Id.* Bowman justified the tactic as a safety practice. *Id.* at 15-16.

Luke contends that, through conversations with nurses and other workers at his facility who had previously worked at Henderson, he learned of the practices Henderson implemented to lower the Admit FIM score. *Id.* at 16. Specifically, Luke contends that Lura Devito,

5

Henderson's assistant director of therapy operations, told Luke that it was Henderson's practice to instruct its employees to transport patients from the ambulance into the facility by gurney regardless of whether the patient could be transported in a wheelchair. *Id.* This resulted in a lower Admit FIM score on the transferring/ambulating criteria. *Id.* Devito also told Luke that Henderson instructed its employees to keep patients in bed for the first three days of their stay regardless of need. *Id.* This would result in a lower Admit FIM score on criteria such as toileting, transferring/ambulating, bathing, dressing, and eating. *Id.*

Manning told Luke that Henderson required all newly admitted patients to receive a bed bath even if the patient could use the shower on their own. *Id.* at 17. This resulted in lower Admit FIM scores in the criteria of bathing and transferring. *Id.* Casupang told Luke that Henderson instructed its employees to watch for any signs of incontinence because only one such occurrence in the first three days is needed to score a patient as incontinent for the Admit FIM. *Id.* Casupang advised Luke that patients are likely to spill bed pans when forced to use them, resulting in lower Admit FIM scores for toileting and ambulating/walking. *Id.* Manning and Casupang both told Luke that Henderson also instructed its employees to round down as needed to lower the Admit FIM score on each FIM criteria. *Id.* Luke then raised this issue with Feth, who confirmed that Healthsouth knew that Henderson used a different scoring system. *Id.*

According to the amended complaint, Henderson implemented these practices regardless of each patient's actual needs or abilities in an effort to produce fraudulently low Admit FIM scores. *Id.* The amended complaint alleges that Patel, with Bowman's knowledge and approval, trained Henderson staff to engage in these tactics. *Id.* at 18.

Luke alleges these practices resulted in Henderson consistently submitting lower average Admit FIM scores than other Healthsouth hospitals in the west region. *Id.* Luke knew of these

discrepancies because, in his capacity as the Las Vegas chief executive officer, he received charts showing the relative performance of the various west region hospitals. *Id.* For example, Henderson's Admit FIM score was approximately 30% lower than the west region average. *Id.* Henderson had a lower Admit FIM score than the average west region hospital in every single FIM criteria. *Id.* at 18-20. And, the difference between Henderson's Admit FIM score and its discharge FIM (assessed 72 hours prior to the patient's discharge) was almost 57% higher than the other west region hospitals' rate of gain between the Admit and discharge FIMs. *Id.* at 19.

In his position as Las Vegas's chief executive officer, Luke also received a weekly indicator spreadsheet that included financial data. *Id.* at 20-21. According to the amended complaint, one such spreadsheet from 2012 suggested that Henderson's artificially low Admit FIM scores resulted in Henderson receiving approximately $3,400 more per patient than other west region Healthsouth facilities. *Id.* at 20-21. Luke alleges Healthsouth executives knew of this effect because they projected in advance that Henderson would obtain higher reimbursement amounts than other west region hospitals. *Id.* at 21. He also alleges that Gray, Beck, and Feth acknowledged that Henderson was told to discontinue its practices but Henderson did not do so, and Healthsouth knew that based on the corporate records. *Id.* at 25.

Luke alleges, based on his experience as chief executive officer of the Las Vegas facility, that Henderson patients were not more ill than other hospitals. *Id.* Luke alleges that patients are assigned to hospitals based on proximity to their homes, not based on level of care. *Id.* Thus, he asserts there is no basis to conclude that Henderson regularly should have more acutely ill patients than the other facilities in the west region, including some that were only about 15 miles away. *Id.*

Luke alleges that Henderson's fraudulent practices resulted in Medicare overpaying thousands of dollars per patient during the period of January 2008 through March 2012, when Bowman resigned as Henderson's chief executive officer. *Id.* In addition to allegedly submitting false claims for payment based on artificially inflated Admit FIM scores, Luke alleges Healthsouth violated the corporate integrity agreement because many Healthsouth employees, including Bowman himself, knew of Henderson's fraudulent practices but did not report them. *Id.* at 24. Luke alleges that by failing to report or remedy the fraudulent practices, Healthsouth fraudulently certified to the United States that it was complying with the corporate integrity agreement. *Id.*

The amended complaint alleges that Healthsouth is operated as a single enterprise, with Healthsouth as the parent company exercising control over each of the subsidiary hospitals. *Id.* The hospitals allegedly are subject to common rules of procedure and operation. *Id.* Healthsouth negotiated the corporate integrity agreement for all of its hospitals, maintains common budgetary information for all of its hospitals, conducts common training, and is "responsible for the management and policies at each of its hospitals." *Id.* at 24-25.

Based on these allegations, the amended complaint asserts a single count against Healthsouth, Henderson, and Bowman under the FCA. *Id.* at 26-27. Although contained in one count, the complaint alleges three different FCA violations. First, the complaint alleges the defendants knowingly presented and caused to be presented false claims for payment under Medicare in violation of 31 U.S.C. § 3729(a)(1)(A). *Id.* at 27. Second, the amended complaint alleges the defendants knowingly made, used, or caused to be made or used false records in connection with false claims for Medicare payments in violation of 31 U.S.C. § 3729(a)(1)(B). *Id.* Finally, the amended complaint alleges the defendants knowingly created false documents,

including false certifications that Healthsouth was in compliance with Medicare rules and regulations under the corporate integrity agreement, and knowingly concealed and/or improperly avoided its obligation to pay or transmit overpayments in violation of 31 U.S.C. § 3729(a)(1)(G). *Id.* at 27-28.[1]

## II. MOTIONS TO DISMISS

In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). However, I do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the complaint. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). A plaintiff must make sufficient factual allegations to establish a plausible entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Such allegations must amount to "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555.

"The FCA is an anti-fraud statute." *Bly-Magee v. Cal.*, 236 F.3d 1014, 1018 (9th Cir. 2001). Consequently, an FCA complaint must be pleaded with particularity under Federal Rule of Civil Procedure 9(b). *Id.* "Rule 9(b) requires a party to state with particularity the circumstances constituting fraud or mistake, including the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)

---

[1] Section 3729(a)(1) imposes liability on "any person" who "knowingly presents, or causes to be presented," a false or fraudulent claim to the United States for payment or approval. 31 U.S.C. § 3729(a)(1). Section 3729(a)(1)(B) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Section 3729(a)(1)(G) "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."

9

(quotation omitted). Additionally, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false.'" *Id.* (quotation omitted). In sum, the relator "must provide enough detail to give [the defendants] notice of the particular misconduct which is alleged to constitute the fraud charged so that [they] can defend against the charge and not just deny that [they have] done anything wrong." *Id.* at 999 (quotation omitted).

To assert an FCA claim, a relator must allege: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *U.S. ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017). The scienter requirement means the defendant had "'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'" *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1996 (2016) (quoting 31 U.S.C. § 3729(b)(1)(A)). Material means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* (quoting 31 U.S.C. § 3729(b)(4)).

As to the fraudulent scheme and whether it caused the government to pay money, a relator need not "identify representative examples of false claims to support every allegation." *Ebeid*, 616 F.3d at 998. While pleading representative examples is "one means of meeting the pleading obligation" under Rule 9(b), it is "sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims [for payment] were actually submitted." *Id.* at 998-99 (quotation omitted).

The Ninth Circuit has disapproved of relaxing the traditional pleading standards for fraud under Rule 9(b) in FCA cases where the supporting evidence is primarily in the defendant's hands, as is sometimes allowed in securities fraud cases. *Id.* at 999. The Ninth Circuit reasoned

that "[t]o jettison the particularity requirement simply because it would facilitate a claim by an outsider is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government." *Id.*

### A. Bowman and Henderson

Luke has adequately alleged with specificity FCA violations under sections 3729(a)(1)(A) and (B) against Henderson and Bowman. Luke alleges Bowman oversaw a fraudulent scheme at Henderson implemented through Patel training the Henderson staff on the allegedly fraudulent practices from 2008 to 2012. He also has adequately alleged a fraudulent course of conduct through manipulation of the Admit FIM score that is used to calculate the reimbursement amount. The question at this stage is not whether Luke will be able to prove his allegations, but rather whether the amended complaint gives the defendants "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019 (quotation omitted). There is no mystery about what Luke alleges was fraudulent.

As to scienter, knowledge may be alleged generally. *See* Fed. R. Civ. P. 9(b). But even so, Luke supports his scienter allegations with facts that Bowman admitted he implemented the three-day bed confinement policy to increase profits and that multiple Healthsouth officials were aware of Henderson's practices and told Henderson to cease using the alternative scoring method. But Henderson and Bowman persisted, with the alleged acquiescence of Healthsouth, who projected in advance that Henderson would obtain higher reimbursement amounts than other west region hospitals and then rewarded Bowman for Henderson's financial performance.

Materiality is satisfied because Luke alleges the fraudulently deflated Admit FIM score is put directly into the software that CMS uses to determine what services a facility like Henderson is expected to provide to patients, and CMS bases the amount of prospective Medicare payments in part on the FIM. The lower the FIM, the higher the reimbursement payment. Luke has thus plausibly alleged materiality because he has alleged manipulation of the criteria by which payment is determined.

Finally, Luke has adequately alleged the fraudulent scheme caused the government to pay out money because he has alleged the details of the alleged scheme to submit false claims along with reliable indicia leading to a strong inference that claims for payment were actually submitted to the United States. He alleges the artificially low Admit FIM scores were directly entered into CMS's system used to determine reimbursement amounts. He also alleges Henderson consistently obtained higher Medicare reimbursement amounts, thus strongly suggesting the claims were submitted to and paid by the United States.

The defendants' argument that Luke is an "outsider" because he never worked at Henderson does not support dismissal. Luke has alleged numerous sources of insider information to plausibly support his allegations, which are pleaded with the requisite particularity, including (1) reports he received and reviewed as chief executive officer of Las Vegas that included financial and FIM-related information about Henderson vis-à-vis other regional hospitals; (2) conversations he had with Bowman and various Healthsouth executives about Henderson's practices; (3) information he was told by employees who had previously worked at Henderson; and (4) Bowman's reluctance to allow a tour of Henderson or discuss its practices. I therefore deny the motions to dismiss the claims against Bowman and Henderson.

However, I grant the potion of Bowman's motion in which he argued that he cannot be held liable for alleged false claims submitted before he started working at Henderson. Luke did not respond to this argument, so he consents to that portion of the motion being granted. LR 7-2(d). It also makes sense, absent contrary factual allegations, that Bowman did not participate in submitting false claims at Henderson before he started working there.

**B. Healthsouth**

The FCA applies to "any person who knowingly *assisted in* causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001) (emphasis in original) (quotation omitted). Consequently, "a person need not be the one who actually submitted the claim forms in order to be liable." *Id.* But there must be "some action by the defendant whereby the claim is presented or caused to be presented." *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991).

On the other hand, alleging that a person who knows about another person's fraud failed to act or remained silent is insufficient to impose FCA liability. *See id.* at 1038-39; *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016) (collecting cases that mere knowledge or mere corporate parent status without some participation in the claims process or fraudulent scheme is insufficient). Luke therefore must plead with particularity that Healthsouth participated in the fraud in some manner.

Luke has adequately alleged Healthsouth is liable on the theory that in addition to being Henderson's chief executive officer, Bowman was a Healthsouth employee. ECF No. 132 at 24. Healthsouth controlled Bowman as a subordinate employee who reported to regional and national Healthsouth supervisors. *Id.* Bowman's Healthsouth superiors were aware of

Bowman's fraudulent scheme but did nothing to stop it and instead rewarded the behavior by giving Bowman an award and promoting him. *Id.* at 12-14, 25-26. The amended complaint thus alleges a Healthsouth employee perpetrated the fraud, Healthsouth controlled that employee, and with knowledge of his conduct not only did not stop the fraud but rewarded it. *See In re Amerco Derivative Litig.*, 252 P.3d 681, 695 (Nev. 2011) (en banc) ("Under basic corporate agency law, the actions of corporate agents are imputed to the corporation."). These allegations go beyond a mere failure to act or silence with knowledge of someone else's fraud. I therefore deny the motion to dismiss Healthsouth.

However, Luke has not alleged with particularity a claim against Healthsouth based on the corporate integrity agreement. Luke alleges Healthsouth, its subsidiaries, and its employees were under an obligation to report fraud pursuant to the corporate integrity agreement. He further alleges Healthsouth knew about Henderson and Bowman's fraudulent practices but nevertheless certified to the United States that it was compliant with Medicare rules and regulations. These allegations are insufficient because Luke does not identify who certified anything to the United States, what was certified, when, or in what document. Healthsouth is left to guess what Luke contends is the offending certifying act, and whether the certification was done with scienter or would be material to the United States' decision to pay.

I therefore dismiss this allegation, with one final opportunity to amend as to the certification theory if Luke can do so. The defendants suggest I should dismiss with prejudice given that Luke already has had an opportunity to amend. Leave to amend "should be granted unless the pleading could not possibly be cured by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016) (quotation omitted). And while

14

Luke has had one prior opportunity, he has not demonstrated repeated failures to cure identified deficiencies. *See id.*

### III. OBJECTIONS TO MAGISTRATE JUDGE RULING AND MOTION TO STAY

The defendants object to Magistrate Judge Ferenbach's order denying their motion for a protective order and move on an emergency basis to stay the requirement that they produce discovery by June 29. First, the defendants contend the Magistrate Judge erred by denying the defendants' request to stay all discovery pending a ruling on the motions to dismiss. Because I have now ruled on the motions to dismiss, I deny as moot this part of the defendants' objections and motion to stay.

Second, the defendants object to Magistrate Judge Ferenbach's ruling denying the defendants' motion for a protective order related to Luke's request for production of all documents exchanged between the Government and the defendants during the Government's investigation prompted by the complaint in this action. The defendants contend the Magistrate Judge erred in denying their motion for a protective order because Luke's request seeks irrelevant documents and is not proportional to the needs of the case.

Specifically, the defendants contend Luke seeks all communications between the defendants and the Government regardless of whether they are related to the allegations in this case because the Government's investigation expanded beyond Luke's allegations. The defendants thus contend Luke has sought "cloned" or "piggyback" discovery by simply asking for whatever the Government obtained instead of making his own discovery requests for information related to his allegations. Second, the defendants contend Luke's request is overbroad because he seeks documents from years not alleged in the amended complaint, related

to entities other than Henderson, and employees' personal emails or emails about practices at Healthsouth-related facilities that are not related to the allegations in this case.

Finally, the defendants argue the request for production seeks communications between the defendants' counsel and the Government, including substantive memoranda discussing legal issues, correspondence regarding scheduling, and cover letters and other procedural correspondence. The defendants contend these items are not relevant to the plaintiffs' claims and are not proportionate to the needs of the case. The defendants also argue that substantive "white papers" that the defendants' counsel exchanged with the Government in furtherance of settlement negotiations that discuss the defendants' legal and factual defenses should not be produced because disclosure of these materials would dissuade defendants in FCA cases from cooperating with the Government if they know the documents will later be produced to the relator.

Luke has not yet responded to the motion to stay or the objections. But in response to the original motion for protective order, he argued that he is not piggybacking or cloning discovery because he is seeking the documents already exchanged with the real party in interest in this case: the United States. Luke argued that in this type of case, a relator has stepped into the Government's shoes and should get any documents the Government obtained, because if the Government intervened it would have access to those documents. Luke contended there is no question the documents are relevant because they were produced by the defendants in response to the Government's requests in this case. Additionally, he contended the burden is minimal because the defendants have already compiled the documents. Luke also argued there is no privilege to protect the white papers exchanged with the Government.

Magistrate judges are authorized to resolve pretrial matters subject to district court review under a "clearly erroneous or contrary to law" standard. 28 U.S.C. § 636(b)(1)(A); *see also* Fed. R. Civ. P. 72(a); LR IB 3-1(a) ("A district judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case pursuant to LR IB 1-3, where it has been shown that the magistrate judge's ruling is clearly erroneous or contrary to law."). A magistrate judge's order is "clearly erroneous" if the reviewing court has "a definite and firm conviction that a mistake has been committed." *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Jadwin v. Cty. of Kern*, 767 F. Supp. 2d 1069, 1110-11 (E.D. Cal. 2011) (quotation omitted). When reviewing discovery decisions, I afford the magistrate judge "broad discretion, which will be overruled only if abused." *Columbia Pictures, Inc. v. Bunnell*, 245 F.R.D. 443, 446 (C.D. Cal. 2007). I "may not simply substitute [my] judgment" for that of the magistrate judge. *Grimes v. City & Cty. of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991).

The scope of discovery is governed by Federal Rule of Civil Procedure 26.

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Relevant evidence is evidence that "has any tendency to make a fact more or less probable than it would be without the evidence . . . ." Fed. R. Evid. 401. Relevance to the case's subject matter for discovery purposes "has been broadly construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351

17

(1978). Evidence need not be admissible to be discoverable. Fed. R. Civ. P. 26(b)(1). "The party opposing discovery has the burden of showing that the discovery is irrelevant, overly broad, or unduly burdensome." *Fosbre v. Las Vegas Sands Corp.*, No. 2:10-cv-00765-APG-GWF, 2016 WL 54202, at *4 (D. Nev. Jan. 5, 2016).

Magistrate Judge Ferenbach's ruling was not clearly erroneous or contrary to law. Luke has not sought cloned discovery. He has requested information produced in this very case to the United States, which was investigating the allegations Luke made in his complaint. That information is plainly relevant to this case's subject matter.

The defendants have not met their burden of showing Luke's request was overbroad. Documents from years not alleged in the complaint may be relevant or lead to relevant evidence because they may show a change in practices once Bowman left Henderson. Documents from related entities other than Henderson (including emails about practices at these facilities) may be relevant because Luke alleges Henderson was an outlier among Healthsouth entities. Thus, information about other facilities may show contrasts between Henderson and other Healthsouth rehabilitation facilities.

The employees' personal emails potentially would be irrelevant or be caught in the net of an overbroad request in relation to the claims and defenses in this case. But the defendants do not explain why employees' personal emails were turned over to the Government if they were not related to the Government's investigation in this case. Perhaps it is because the defendants assert they agreed to give over all documents from certain records custodians. *See* ECF No. 114 at 8. But the defendants do not offer this explanation, they present no evidence in support of this assertion, and I cannot assume that is the reason all of the personal emails were provided to the Government. The defendants have not met their burden simply by characterizing an unidentified

18

number of emails as personal and without explanation for why those emails were turned over to the Government in the first place.

Finally, as to the communications between the defendants' counsel and the Government, those documents appear to fall into two general categories: (1) substantive memoranda discussing legal issues and (2) correspondence regarding scheduling, cover letters, and other procedural correspondence. As to the first category of documents, Magistrate Judge Ferenbach's ruling is not clearly erroneous or contrary to law. The legal memoranda or "white papers" are not privileged and would be plainly relevant, as they discuss the facts and legal issues in this case. The defendants' argument that FCA defendants no longer will cooperate with the Government if forced to turn over this evidence does not persuade me that the Magistrate Judge erred. Defendants will have plenty of incentive to cooperate with the Government when faced with an FCA complaint which the Government is investigating to decide whether to intervene.

As to the correspondence regarding procedural matters, the relevance is tenuous. Luke contends it may show Healthsouth's ability to control Henderson, although how routine scheduling correspondence would show that is less than clear. Nevertheless, it appears from the record that it would be more burdensome to sift through the documents and remove these items from production than it would be to simply turn over the entirety of the communications between the defendants and the Government. *See* ECF No. 122 at 23, 27. Magistrate Judge Ferenbach's decision to tip the scale in favor of the possible relevance of these records given the "microscopic" burden of producing them was not clearly erroneous or contrary to law. *Id.* at 27-28.

I therefore affirm Magistrate Judge Ferenbach's ruling and overrule the defendants' objections. As a result, I also deny the motion to stay production.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that the defendants' motions to dismiss **(ECF Nos. 133, 134) are GRANTED in part** as set forth in this order.

IT IS FURTHER ORDERED that relator Joshua Luke may file an amended complaint on or before July 27, 2018, related to the allegations that defendant Healthsouth Corporation falsely certified compliance.

IT IS FURTHER ORDERED that the defendants' objections **(ECF No. 146) are OVERRULED**.

IT IS FURTHER ORDERED that the defendants' emergency motion to stay **(ECF No. 147) is DENIED**.

DATED this 28th day of June, 2018.

ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE